Samuel B. POLLOCK Jr. and Laura Pollock, Plaintiffs–Appellants,

v.

Sandra T. POLLOCK, Oliver H. Barber, and Luann C. Glidewell, Defendants–Appellees.

No. 97–5803.

United States Court of Appeals, Sixth Circuit.

Argued April 24, 1998.

Decided Sept. 1, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 16, 1998.

Samuel Manly (argued and briefed), Louisville, KY, for Plaintiffs–Appellants.

Allen K. Gailor (argued and briefed), Louisville, KY, for Defendants–Appellees.

Before: BATCHELDER and COLE, Circuit Judges; McCALLA, District Judge.*

**OPINION**

McCALLA, District Judge.

Plaintiffs Samuel and Laura Pollock appeal the judgment of the district court granting Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56.[1] Plaintiffs brought an action against Defendants, alleging that Defendants violated the federal wiretapping statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521 ("Title III"), when Defendant Sandra Pollock tape-recorded conversations between her ex-husband, Plaintiff Samuel Pollock, and their minor daughter Courtney, and between Plaintiff Samuel Pollock's current wife, Plaintiff Laura Pollock, and Courtney. On appeal, we must determine: (1) whether the statutory consent exception contained in 18 U.S.C. § 2511(2)(d) of the federal wiretapping statute permits a parent to "vicariously consent" to recording a telephone conversation on behalf of a minor child in that parent's custody, without the

---

* The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

1. Defendants' motion was styled as a motion to dismiss Plaintiffs' amended complaint pursuant to Fed.R.Civ.P. 12(b)(6). Because both parties' briefs included, and relied upon, extraneous material, the district court construed Defendants' motion as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b).

actual consent of the child; and (2) if "vicarious consent" does qualify for the consent exception, whether questions of material fact precluding summary judgment exist as to whether Defendant Sandra Pollock's recording of her minor daughter's phone conversations with the child's father and step-mother was motivated by concern for the child's best interest. The district court concluded that "vicarious consent" to recording a telephone conversation, by a parent on behalf of a minor child in that parent's custody, qualifies for the statutory consent exception, and found that no questions of material fact existed as to Defendant Sandra Pollock's motivation in recording the conversations. Accordingly, the district court granted summary judgment for Defendants. For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court.

## I.

Samuel Pollock ("Samuel") and his current wife, Laura Pollock ("Laura"), are Plaintiffs–Appellants in this matter. Samuel's former wife, Sandra Pollock ("Sandra"), and her attorneys, Oliver Barber ("Barber") and Luann Glidewell ("Glidewell"), are Defendants–Appellees. Samuel and Sandra were married in 1977, and had three children: Courtney Pollock, born April 24, 1981; Robert Pollock, born May 24, 1984; and Ian Pollock, born July 8, 1987. Samuel and Sandra separated in 1992, after Sandra discovered that Samuel had been having an extramarital affair. Joint Appendix ("J.A.") at 127. Their divorce became final in 1993, and the final divorce decree granted Sandra custody of all three children.

After the divorce, Samuel married Laura. In 1995, during the pendency of an appeal from the Jefferson County Circuit Court's property and support decrees, Sandra taped certain telephone conversations between Courtney and Samuel, and between Courtney and Laura. It is undisputed that Courtney, Samuel, and Laura did not consent to the recording of these conversations. Rather, Sandra argues that she "vicariously consented" to the recording on behalf of Courtney, a minor child in her custody, because she was concerned that Samuel was emotionally abusing Courtney.

## A.

Careful consideration of the complete record in this matter is essential to the determination of the issues before us. As we conduct our analysis, it is important to be cognizant of the fact that the tape recordings by Sandra Pollock that form the basis of this lawsuit occurred in the context of a bitter and protracted child custody dispute. Accordingly, we begin with a summary of the events leading up to, and relating to, the tape-recording of the conversations by Sandra Pollock.

In May of 1994, Sandra learned that a telephone conversation between herself and her daughter Courtney had been tape-recorded.[2] Sandra contends that Courtney told her that Samuel and Laura had tape-recorded the telephone call, but that Courtney would not give any further details. J.A. at 102. Laura and Courtney contend that Courtney told Sandra that *Courtney* had recorded a conversation with her mother from her father's home, with Samuel and Laura's knowledge and consent. J.A. at 157, 160. Laura concedes that on April 10, 1994, "Courtney tape-recorded a telephone conversation with Sandra with my knowledge and consent and with the knowledge and consent of my husband, Sam."[3] J.A. at 157.

Sandra contends that Samuel was very upset about losing custody of the children, especially Courtney.[4] J.A. at 101. Accord-

**2.** It is unclear whether Courtney told Sandra that one conversation, or multiple conversations, had been recorded.

**3.** Although this incident may or may not be a contributing factor to Sandra's later taping of Courtney's conversations with Samuel and Laura, it is not the taping incident at issue in this case.

**4.** The record contains copies of two settlement letters from Samuel's attorney in which he offers to drop this lawsuit in exchange for joint custody of Courtney, with Courtney residing with him. J.A. at 146–51.

ing to Sandra's affidavit, during the divorce proceedings, and even after Jefferson County Circuit Court Judge Geoffrey P. Morris confirmed Sandra's custody of the children in April of 1994,[5] she "believed that Courtney was being subject to emotional and psychological pressure by Samuel and Samuel's wife, Laura, whereby Samuel was trying to get Courtney to do whatever she could to convince [Sandra] to let Courtney primarily live with Samuel." J.A. at 102. During this process, Sandra contends that she "noticed a gradual change in Courtney which included what [Sandra] felt was a[sic] excessive or compulsive desire to be with her father and corresponding deteriorating relationship with [Sandra]." *Id.* According to Sandra, she "could not determine merely from talking with or observing Courtney how far this desire of Courtney extended but [Sandra] believed, at the minimum, the psychological and emotional pressure which she believed was being put upon Courtney by Samuel was detrimental to Courtney and perhaps rose to the state of abuse or emotional harm or injury." *Id.*

According to Sandra, it was this concern for Courtney, who was fourteen years old at the time, that caused her to place a tape recorder on her extension telephone in her bedroom to monitor the telephone activity at her house. J.A. at 102–03. Sandra maintains that her only motivation in doing this was "concern for her child's well being." *Id.* The monitoring began in May of 1995, and lasted only a few weeks. During the course of the monitoring, Sandra heard a conversation between Courtney and Laura "which greatly alarmed and frightened" her and "gave [her] immediate concern for the safety

and well being of 3 other individuals and confirmed to [her] the abuse and emotional injury and harm she suspected Courtney was being subjected to." J.A. at 103. The substance of that conversation, according to Laura,[6] was the following:

> In late May of 1995, Courtney called me up one night when Sam was not at home, and was upset and complaining of Judge Morris's decision to require her to live with Sandra. Courtney began, as is not unusual for a teenager to do, to let off steam, even to the point of remarking—*in obvious jest and with no semblance of seriousness*—that she would like to kill "the two of them," referring to Oliver Barber and Luann Glidewell [Sandra's attorneys]. In equal jest, I joined in her sentiments, adding Judge Morris to the "hit list."

J.A. at 157 (emphasis in original). According to Laura, neither she, nor Courtney, took this conversation seriously, "as is obvious to anyone who would listen to the tape recording." [7] *Id.*

Because Sandra was disturbed by this conversation, she reported it to her attorney, Oliver Barber. J.A. at 103. After learning of the conversation's contents, Sandra alleges that Barber felt compelled by Ky.Rev.Stat. Ann. § 620.030,[8] to report the conversation to the Crimes Against Children Unit ("CACU"), a joint task force operated by the Louisville Division of Police and Jefferson County Police Department. *Id.* Barber had Sandra's permission to report the conversation. *Id.* Sandra ceased monitoring after she reported this conversation to Barber. *Id.* Subsequent to this, Courtney discovered the rest of the

---

5. Judge Morris' April 19, 1994 Findings of Fact and Conclusions of Law note that Judge Morris interviewed Courtney and she expressed that she preferred to stay with her father, rather than her mother. J.A. at 113. Even so, Judge Morris found that Sandra should retain custody of Courtney. On May 13, 1995, Judge Morris issued Amended Findings of Fact and Conclusions of Law, again confirming his prior grant of custody of Courtney to Sandra, over Courtney's and Samuel's objections. J.A. at 128.

6. A transcript of the actual conversation is not included in the record, and Sandra does not discuss the contents of the conversation in her affidavit. Accordingly, the only sources regard-

ing this conversation are the declarations submitted by Laura and Courtney, which describe the conversation as set forth above.

7. The Court was not provided with a copy of the tape.

8. Ky.Rev.Stat. Ann. § 620.030 provides:

(1) Any person who knows or has reasonable cause to believe that a child is dependent, neglected or abused shall *immediately* cause an oral or written report to be made to a local law enforcement agency or the Kentucky state police. . . .

tapes in her mother's bathroom cabinet and gave them to Samuel and Laura.

The CACU then disclosed the contents of the tape containing the above conversation to Judge Morris, who had presided over Samuel and Sandra's divorce and subsequent custody disputes. A transcript of the conversation was made a part of the official record in the case, and Judge Morris recused himself.

According to Samuel and Laura, Sandra was not motivated by concern for Courtney when she recorded the phone conversations. Instead, they contend that Sandra was angry that Courtney had taped a conversation between herself and Sandra with Samuel and Laura's consent, and "wanted to return the favor by taping Courtney's conversations with Sam and [Laura]." J.A. at 155–56. Laura further contends that immediately before the recording began, Sandra discovered Courtney's diary, in which Courtney had recorded that she was being represented by counsel (hired by her father Samuel), Rebecca Ward, incident to the then on-going dispute as to Courtney's custody. J.A. at 156. Before discovering the diary, Sandra was unaware that Courtney had her own attorney. *Id.* Rather than being motivated by concern for Courtney's welfare, Laura contends that "Sandra's predominant motive in eavesdropping on the children's calls was to overhear Courtney's confidential, attorney-client conversations with her lawyer." *Id.*

In addition, Courtney's declaration states: "I believe my mother started recording calls when she discovered my diary entries which said that I was being represented by my own attorney, Becky Ward. At about the same time, someone had reported my mother to the authorities for possible abuse and neglect of me and my brothers." J.A. at 159–60. As to the state of her relationship with her mother, or any deterioration thereof, Courtney states: "I simply do not get along well with my mother, and do get along well with my father and stepmother. I was not happy at all living with my mother, and so told Judge Morris when he interviewed

me.... The decision which Judge Morris made, against my wishes, to require me to live with my mother led to the further deterioration of my relationship with her." J.A. at 159. Finally, Courtney alleges that "[her] relationship with [her] mother was not helped by [Sandra] dating a man only a few years older than [Courtney] was, who had been convicted of a crime." *Id.*[9]

Samuel and Laura filed their amended complaint on January 16, 1996. Counts 1–5 of the amended complaint allege that Sandra violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting telephonic communications between two parties without either party's consent. Counts 6–11 allege that Sandra, Barber, and Glidewell violated 18 U.S.C. § 2511(1)(b)-(d) by intentionally using and disclosing the contents of these communications to third parties. Samuel and Laura also allege a violation of their right to privacy under Kentucky common law. In response to the complaint, Defendants filed a motion to dismiss, which the district court construed as a motion for summary judgment. On May 22, 1997, the district court granted summary judgment for Defendants, finding that Sandra had vicariously consented to the recording of the phone calls, and thus qualified for the consent exception found in 18 U.S.C. § 2511(2)(d). Because the court found that Sandra's interceptions of the phone conversations were not unlawful, the district court granted summary judgment as to the claims against Sandra, Barber, and Glidewell for distribution and use of the tapes. Finally, as all of the federal claims were dismissed before trial, the court dismissed the pendent state claims as well. Plaintiffs Samuel and Laura then filed this appeal.

## II.

We review a district court's grant of summary judgment *de novo*. *City Management Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 250 (6th Cir.1994). Accordingly, we must consider all facts and inferences drawn therefrom in the light most favorable to the non-

---

9. Judge Morris' April 19, 1994 Findings of Fact and Conclusions of Law make reference to a Mr. Kevin Downs as follows: "The relationship [Sandra] has established with a convicted felon (Mr.

Kevin Downs) and her visits to see Mr. Downs while in jail has required this Court to order [Sandra] not to allow the children to have any contact with Mr. Downs." J.A. at 113.

moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

### III.

Plaintiffs allege that Sandra and her attorneys violated Title III when: (1) Sandra taped conversations between Courtney and Plaintiffs; (2) Sandra disclosed these conversations to her attorneys; and (3) Sandra and her attorneys disclosed these conversations to the CACU. As set forth above, there appears to be no dispute that Sandra intentionally intercepted the phone calls or that Defendants intentionally disclosed the contents thereof.[10] Instead, this case raises two principal questions. First, whether a parent, motivated by concern for the welfare of his or her child, can "vicariously consent" to tape-recording the calls of a minor child, when the child has not consented to the recording. If we answer this question in the negative, judgment must be entered for Plaintiffs, and our inquiry ends there. If, however, vicarious consent does qualify for the consent exception to the wiretap statute, we must then address the second question: whether questions of fact precluding summary judgment exist as to Sandra's motivation in recording the telephone calls at issue in this case.

### A.

Conversations intercepted with the consent of either of the parties are explicitly exempted from Title III liability.[11] The question of whether a parent can "vicariously consent" to the recording of her minor child's phone calls, however, is a question of first impression in all of the federal circuits.[12] Indeed, while other circuits have addressed cases raising similar issues, these have all been decided on different grounds, as will be discussed below. The only federal courts to directly address the concept of vicarious consent thus far have been a district court in Utah, *Thompson v. Dulaney*, 838 F.Supp.

10. Title 18 U.S.C. § 2511(1) provides that a claim under Title III can be made against any person who:

(a) intentionally intercepts ... the contents of any wire, oral, or electronic communication;
...
(c) intentionally discloses ... to any person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
(d) intentionally uses ... the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection....

11. Title 18 U.S.C. § 2511(2)(d) provides:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception....

12. We note that although it can be argued, from a policy perspective, that the federal courts should stay out of these kinds of domestic disputes, that option has been foreclosed by the decisions of this Court and numerous other federal courts. In one of the earliest cases to address the issue of domestic wiretaps in a case involving interspousal wiretapping, *Simpson v. Simpson*, 490 F.2d 803, 805 (5th Cir.1974), *cert. denied*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), the Fifth Circuit stated, "The naked language of Title III, by virtue of its inclusiveness, reaches this case. However, we are of the opinion that Congress did not intend such a result, one extending into areas normally left to states, those of the marital home and domestic conflicts." While the Fifth Circuit has not overruled that decision, it has been severely criticized by a number of other circuits, beginning with this Court in *United States v. Jones*, 542 F.2d 661, 673 (6th Cir.1976) (holding that "the plain language of § 2511 and the Act's legislative history compels interpretation of the statute to include interspousal wiretaps"). *See also Heggy v. Heggy*, 944 F.2d 1537, 1539 (10th Cir.1991) (holding that "Title III does apply to interspousal wiretapping within the home"), *cert. denied*, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992); *Kempf v. Kempf*, 868 F.2d 970, 973 (8th Cir.1989) (holding that "the conduct of a spouse in wiretapping the telephone communications of the other spouse within the marital home falls within [Title III's] purview"); *Pritchard v. Pritchard*, 732 F.2d 372, 374 (4th Cir.1984) (stating that there is "no legislative history that Congress intended to imply an exception to facts involving interspousal wiretapping").

1535 (D.Utah 1993), a district court in Arkansas, *Campbell v. Price,* 2 F.Supp.2d 1186 (E.D.Ark.1998), and the district court in this case, *Pollock v. Pollock,* 975 F.Supp. 974 (W.D.Ky.1997).

### B.

As a threshold matter, we note that Seventh, Tenth, and Second Circuits have decided cases with facts similar to those of this case on different grounds, holding that parental wiretapping without the consent of the minor child does not violate Title III because the recording was done from an extension phone within the home. *Scheib v. Grant,* 22 F.3d 149 (7th Cir.1994); *Newcomb v. Ingle,* 944 F.2d 1534 (10th Cir.1991); *Janecka v. Franklin,* 843 F.2d 110 (2d Cir.1988); *Anonymous v. Anonymous,* 558 F.2d 677 (2d Cir. 1977). The "extension telephone" exemption, also known as the "ordinary course of business exemption," is set forth in 18 U.S.C. § 2510(5)(a)(i), which expressly exempts from the coverage of Title III "any telephone or telegraph instrument, equipment or facility or any component thereof ... being used by the subscriber or user in the ordinary course of its business...."

From this language, the Seventh, Tenth, and Second Circuits have held that the § 2510(5)(a)(i) exemption was intended to cover tape recorders attached to extension phones in the home. In *Scheib,* the Seventh Circuit stated:

> The language of § 2510(5)(a)(i) juxtaposes the terms "subscriber" and "user" with the phrase "in the ordinary course of business." Although the latter phrase might be used to distinguish commercial from personal life, in the context presented here, it must be read in conjunction with the terms "subscriber" and "user." These terms certainly do not have exclusively market-oriented connotations. Reading this extension phone exemption as a whole, then, it is no lexical stretch to read this language as applying to a "subscriber's" conduct—or "business"—in raising his or her children.

*Scheib,* 22 F.3d at 154.

In 1995, however, this Court expressly rejected the line of cases holding that the extension exemption extended to the home in *United States v. Murdock,* 63 F.3d 1391 (6th Cir.1995).[13] Instead, this Court held that the statute did not permit the sort of extension phone recordings at issue in this case. *Murdock,* 63 F.3d at 1396 ("[W]e conclude that the recording mechanism (a tape recorder connected to extension phones in Mrs. Murdock's home) does not qualify for the telephone extension (or business extension) exemption."). The Court further noted that "spying on one's spouse does not constitute use of an extension phone in the ordinary course of business." *Id.* at 1400.[14]

Accordingly, this Court's rejection of the "extension exemption" in these types of cases dictates that the cases discussed above, though cited by both parties, are not persuasive as to the issue of vicarious consent.

### C.

The district court in the instant case held that Sandra's "vicarious consent" to the taping of Courtney's phone calls qualified for the consent exemption under § 2511(2)(d). Accordingly, the court held that Sandra did not violate Title III. The court based this decision on the reasoning found in *Thompson v. Dulaney,* 838 F.Supp. 1535 (D.Utah 1993), and *Silas v. Silas,* 680 So.2d 368 (Ala.Civ. App.1996).

The district court in *Thompson* was the first court to address the authority of a parent to vicariously consent to the taping of phone conversations on behalf of minor children. In *Thompson,* a mother, who had custody of her three and five-year-old chil-

**13.** In *Murdock,* the defendant had been convicted after the district court admitted into evidence incriminating tape-recordings made by his estranged wife.

**14.** In *State v. Shaw,* 103 N.C.App. 268, 404 S.E.2d 887 (1991), the North Carolina Court of Appeals held that a mother who recorded her son's telephone conversation regarding an upcoming drug deal, from a telephone extension in her home using a microcassette recorder, violated Title III. ("There was no evidence before the trial court that the mother used a microcassette recorder 'in the ordinary course of business.' ") *Shaw,* 404 S.E.2d at 889.

dren, recorded conversations between the children and their father (her ex-husband) from a telephone in her home. 838 F.Supp. at 1537. The court held:

> [A]s long as the guardian has a *good faith basis* that it is *objectively reasonable* for believing that it is *necessary* to consent on behalf of her minor children to the taping of phone conversations, vicarious consent will be permissible in order for the guardian to fulfill her statutory mandate to act in the best interests of the children.

*Id.* at 1544 (emphasis added). The court noted that, while it was not announcing a *per se* rule approving of vicarious consent in all circumstances, "the holding of [*Thompson*] is clearly driven by the fact that this case involves two minor children whose relationship with their mother/guardian was allegedly being undermined by their father." *Id.* at 1544 n. 8.

An obvious distinction between this case and *Thompson*, however, is the age of the children for whom the parents vicariously consented. In *Thompson*, the children were three and five years old, and the court noted that a factor in its decision was that the children were minors who "lack[ed] both the capacity to [legally] consent and the ability to give actual consent." *Id.* at 1543. The district court in the instant case, in which Courtney was fourteen years old at the time of the recording, addressed this point in a footnote, stating:

> Not withstanding this distinction [as to the age of the children], *Thompson* is helpful to our determination here, and we are not inclined to view Courtney's own ability to actually consent as mutually exclusive with her mother's ability to vicariously consent on her behalf.

*Pollock v. Pollock*, 975 F.Supp. 974, 978 n. 2 (W.D.Ky.1997).

The only other federal case to address the doctrine of vicarious consent is also the most recent case to analyze this issue. In *Campbell v. Price*, 2 F.Supp.2d 1186 (E.D.Ark.

1998), a father, who had custody of his twelve-year-old daughter, tape-recorded conversations between the child and her mother because the father observed that his daughter "would cry and become upset after talking with her mother on the phone," and he was concerned that the mother was emotionally abusing the child. 2 F.Supp.2d at 1187. The child's mother then brought an action against the child's father, alleging that he violated 18 U.S.C. § 2511 by intentionally intercepting and recording conversations between herself and her minor daughter. *Id.* at 1188. The court, noting that "[it] uncovered no cases rejecting the vicarious consent argument," and "find[ing] persuasive the cases allowing vicarious consent," adopted the concept of vicarious consent and granted summary judgment for the father. *Id.* at 1189. In support of its decision, the court cited *Thompson* and the district court's opinion in the instant case, and noted that these cases "clearly stand for the proposition that a defendant's good faith concern for his minor child's best interests, may, without liability under Title III, empower the parent to intercept the child's conversations with the noncustodial parent." *Id.* at 1191.

In addition, two state courts have recently addressed the issue of vicarious consent by a parent on behalf of a minor child under the applicable state's version of the federal wiretap act, *Silas v. Silas*, 680 So.2d 368 (Ala.Civ. App.1996) and *State v. Diaz*, 308 N.J.Super. 504, 706 A.2d 264 (1998), and two state courts have addressed the issue under both the state and federal statutes, *Williams v. Williams*, 229 Mich.App. 318, 581 N.W.2d 777 (1998) and *West Virginia Dep't of Health & Human Resources v. David L.*, 192 W.Va. 663, 453 S.E.2d 646 (1994).

In *Silas*,[15] the court held that a father had authority to consent on behalf of his seven-year-old son to taping phone conversations with the child's mother, pursuant to Alabama's version of the federal wiretap statute.[16] The court did, however, make the test

---

15. The district court in this case also relied upon *Silas* in support of its decision.

16. The *Silas* court also addressed the question of parental wiretaps under Title III and held, in accordance with the circuits discussed *supra*,

that the father's actions were exempt under the "extension exemption." 680 So.2d at 370. As set forth above, that exemption is not available as a basis for the decision in this case. *United States v. Murdock*, 63 F.3d 1391 (6th Cir.1995).

for valid vicarious consent more stringent than the one set forth in *Thompson*, in that it specifically required the parent to have a "good faith basis that it is objectively reasonable to believe that the minor child is being *abused, threatened, or intimidated by the other parent,*" *Silas*, 680 So.2d at 371 (emphasis added), as opposed to the *Thompson* court's requirement of "a good faith basis that is objectively reasonable for believing that it is necessary ... [and] in the best interests of the [child]." 838 F.Supp. at 1544. The district court in the instant case adopted the test as set forth in *Thompson*. *Pollock*, 975 F.Supp. at 978.

In *State v. Diaz*, 308 N.J.Super. 504, 706 A.2d 264 (1998), the court held that parents could vicariously consent on behalf of their five-month-old infant to recording a nanny abusing the child on videotape, under New Jersey's version of the federal wiretap act. The Court in *Diaz* noted that the New Jersey statute was modeled after the federal statute, and cited *Thompson* and the district court's opinion in this case in support of its holding that the state statute incorporates the theory of vicarious consent. *Diaz*, at 514–15, 706 A.2d 264.

Finally, two state courts have addressed this issue under both the federal and state wiretap statutes. The Court of Appeals of Michigan is the only court that has evaluated the concept of vicarious consent and declined to adopt it. In *Williams v. Williams*, 229 Mich.App. 318, 581 N.W.2d 777 (1998), a divorced father tape-recorded conversations between his five-year-old son and the child's mother. The *Williams* court reversed the lower court's grant of summary judgment for the father, holding that the "language [of Title III] gives us no indication that Congress intended to create an exception for a custodial parent of a minor child to consent on the child's behalf and tape record telephone conversations between the child and a third party." 581 N.W.2d 777, 780. The court noted, however, that in declining to adopt the doctrine of vicarious consent, it was departing from the path chosen by all of the other courts that have addressed this

issue. *Williams*, 581 N.W.2d 777, 781 ("[W]e nonetheless recognize that several courts in other jurisdictions have analyzed this precise issue....In general, these courts have been willing to extend the consent exception in the federal wiretapping act to include vicarious consent by a parent on behalf of his or her minor child to intercepting and using communications with a third party where such action is in the child's best interests.").

In the final case to address this issue, *West Virginia Dep't of Health & Human Resources v. David L.*, 192 W.Va. 663, 453 S.E.2d 646 (1994), the court discussed the concept of vicarious consent under both Title III and the West Virginia statute. The facts of *David L.* are distinguishable from the facts in the instant case. In *David L.*, the court held that a father violated Title III when he recorded conversations between his children and their mother (his ex-wife) via a tape recorder secretly installed *in the mother's home.*[17] 453 S.E.2d at 648. The father, David L., argued that, under the state's version of the wiretap statute, he had authority to vicariously consent to the taping on behalf of his children. *Id.* at 653. The court rejected this argument and held that "under the specific facts of the case before us, ... a parent has no right on behalf of his or her children to give consent under W. Va.Code § 62–1D–3(c)(2) or 18 U.S.C. § 2511(2)(d), to have the children's conversations with the other parent recorded while the children are in the other parent's house." *Id.* at 654. In so holding, however, the court discussed *Thompson* and stated:

> We do not disagree with the reasoning in *Thompson*; however, we determine the facts of the present case are different from the facts of in *Thompson* in two significant respects. First, [in *Thompson*], the children were physically residing with [their mother] at the time the conversations were recorded. Second, the conversations were recorded from a telephone in the house where [the mother] and her children resided. On the other hand, in the present case, first, [the mother], not [the father], was awarded temporary custody of the

17. The children's paternal grandmother installed the tape recorder in the children's bedroom, pursuant to her son's request, when she was in the mother's home babysitting the children.

children during the divorce proceedings. Second, the recordings occurred in [the mother's] house, not [the father's] house, and he had absolutely no dominion or control over [the mother's] house where he procured his mother's assistance to hide the tape recorder.

*Id.* (emphasis added). The court further noted:

> We draw a distinction between the present situation and a situation in which a guardian, *who lives with the children and who has a duty to protect the welfare of the children,* gives consent on behalf of the children to intercept telephone conversations *within the house where the guardian and the children reside.*

*Id.* at 654 n. 11 (emphasis added). Accordingly, while the court in *David L.* declined to permit vicarious consent in that particular case, it appears from the above language that the court did not oppose the concept of vicarious consent to a parental wiretap in all cases.

**D.**

■ After this review of the relevant case law, we conclude that although the child ·in this case is older than the children in the cases discussed above in which the doctrine of vicarious consent has been adopted, we agree with the district court's adoption of the doctrine, provided that a clear emphasis is put on the need for the "consenting" parent to demonstrate a good faith, objectively reasonable basis for believing such consent was necessary for the welfare of the child. Accordingly, we adopt the standard set forth by the district court in *Thompson* and hold that as long as the guardian has a good faith, objectively reasonable basis for believing that it is necessary and in the best interest of the child to consent on behalf of his or her minor child to the taping of telephone conversations, the guardian may vicariously consent on behalf of the child to the recording. *See Thompson,* 838 F.Supp. at 1544. Such vicarious consent will be exempt from liability under Title III, pursuant to the consent exception contained in 18 U.S.C. § 2511(2)(d).

We stress that while this doctrine should not be interpreted as permitting parents to tape any conversation involving their child simply by invoking the magic words: "I was doing it in his/her best interest," there are situations, such as verbal, emotional, or sexual abuse by the other parent, that make such a doctrine necessary to protect the child from harm. It is clear that this is especially true in the case of children who are very young. It would be problematic, however, for the Court to attempt to limit the application of the doctrine to children of a certain age, as not all children develop emotionally and intellectually on the same timetable, and we decline to do so.

Moreover, support for adopting the doctrine is found in the decisions of the Seventh, Tenth, and Second Circuits which have permitted parental taping of minor children's conversations in situations similar to this one on the "extension exemption" ground. *Scheib v.·Grant,* 22 F.3d 149 (7th Cir.1994); *Newcomb v. Ingle,* 944 F.2d 1534 (10th Cir. 1991); *Janecka v. Franklin,* 843 F.2d 110 (2d Cir.1988); *Anonymous v. Anonymous,* 558 F.2d 677 (2d Cir.1977). Thus, while these cases address the question from a different perspective than the instant case, the end result—that these kinds of wiretaps should be permitted in certain instances—supports adoption of the doctrine. *See Scheib,* 22 F.3d at 154 ("We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for that child's well-being.").[18] Accordingly, the district court's adoption of the concept of vicarious consent is **AFFIRMED.**

**IV.**

■ We turn next to the question of whether questions of material fact exist as to Sandra's motivation and purpose in taping the telephone conversations at issue that would preclude summary judgment for the Defendants. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

18. The child in *Scheib* was eleven years old. 22 F.3d at 150.

any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *id.* at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make· such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986).

· When confronted with a properly supported motion, for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### A.

The district court found that no question, of material fact existed as to whether Sandra was motivated by genuine concern for her child's best interest, and granted summary judgment for Defendants. We disagree. Upon a *de novo* review of the record, it appears that questions of fact precluding summary judgment exist as to whether Sandra had a good faith basis that was objectively reasonable for believing it was necessary to consent on behalf of her minor child to the taping of these conversations.

As set forth above, both Laura and Courtney submitted declarations asserting that Sandra was motivated by something other than concern for her child's welfare. The allegations that Sandra was taping the phone conversations to gain access to Courtney's attorney-client communication with her lawyer, combined with the fact that the taping began soon after Sandra found the diary in which Courtney stated that her father had hired a lawyer to represent her, without Sandra's knowledge or consent, create a question of material fact as to Sandra's motives. J.A. at 155–56. Moreover, Courtney's allegations in her declaration that the deterioration in her relationship with her mother was caused by the fact that she did not get along with her mother, and by her mother's relationship with a convicted felon "only a few years older than [Courtney]," rather than by anything done by her father, further contribute to our determination that questions of material fact exist. J.A. 159–60.[19]

The district court did not directly address any of the, statements contained in Laura's and Courtney's declarations.[20] In

---

**19.** In addition, Courtney alleges that at about the same time that Sandra began taping the phone conversations, "someone had reported [Sandra] to the authorities for possible abuse and neglect of me and my brothers." J.A. at 160. Reading all inferences of fact in favor of Plaintiffs, as we must do on· Defendants' motion for summary judgment, we note that such· an allegation against her could provide further motive for Sandra to embark on a mission to "gather dirt" on Samuel in the context of their battle for custody of the children.

**20.** Defendants acknowledge that the district court did not directly address Laura and Courtney's allegations. In doing so, however, Defendants make much of the fact that the declarations were "unsworn affidavits." An unsworn

affidavit cannot be used to support or oppose a motion for summary judgment. *See Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) ("the unsworn statements of the two employees ... must be disregarded because a court may not consider unsworn statements when ruling on a motion for summary judgment"). However, a statutory exception to this rule exists which permits an unsworn declaration to substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury, certified as true and correct, dated, and signed. 28 U.S.C. § 1746; *see also Williams v. Browman,* 981 F.2d 901, 904 (6th Cir.1992). Both Laura's and Courtney's declarations contain the statement: "I declare, under penalty of perjury, that the foregoing is true and correct," and both· declarations are

granting summary judgment for Defendants, the district court stated:

> We find no ... countervailing evidence offered by the plaintiffs that would eviscerate Sandra's vicarious consent defense here and preclude summary judgment. Sandra's affidavit clearly supports her claim that she acted to protect the welfare of her children in taping the conversations at issue.... [P]laintiffs have offered no evidence tending to suggest that the vicarious consent defense is inappropriate here or that Sandra's "child welfare" contention is pretextual. The plaintiffs cannot simply point to the tension and bitterness among the parties and expect the court to leap to the conclusion that Sandra's motives in taping were improper.[21]

*Pollock v. Pollock*, 975 F.Supp. 974, 979 (W.D.Ky.1997). In support of the decision to grant summary judgment, the district court cited *Silas* and *Scheib*, in which summary judgment was granted in favor of the taping parent. The facts in these two cases, however, were quite different than those in the instant case. In *Silas*, the father asserted that he began taping conversations between his seven-year-old son and the child's mother after "observing several instances when the minor child became extremely upset and began to cry during the telephone conversations." *Silas v. Silas*, 680 So.2d 368, 371 (Ala.Civ.App.1996). In *Scheib*,[22] the father who taped his eleven year old child's phone conversations stated that "on more than one occasion, [the child] became upset after speaking with his mother." *Scheib v. Grant*, 22 F.3d 149, 150 (7th Cir.1994).[23] In contrast, here Sandra states only that she "noticed a gradual change in Courtney which included what [Sandra] felt was a[sic] excessive or compulsive desire to be with her father and corresponding deteriorating relationship with [Sandra]." J.A. at 102.

In *Thompson*, the district court, after approving of the doctrine of vicarious consent, declined to grant summary judgment because there was conflicting evidence as to what the mother's "purpose" was in intercepting the conversations. *Thompson v. Dulaney*, 838 F.Supp. 1535, 1545 (D.Utah 1993). Given the conflicting evidence offered by the parties, we find that there is a dispute as to material facts, making this case inappropriate for summary judgment. Thus, as in *Thompson*, while the doctrine of vicarious consent is properly adopted, there are questions of material fact as to Sandra's motivation in taping the conversations, and this issue should be submitted to a jury.

**B.**

If the jury determines that Sandra did properly consent on behalf of her minor child because she had a good faith, objectively reasonable belief that such consent was necessary and in the best interest of the child, judgment must be entered for Defendants as to the use and disclosure claims against Sandra, Barber, and Glidewell because the taping of the conversations would not, therefore, have been illegal. In order to state a claim for use or disclosure in violation of Title III, the communication at issue must be the product of an illegal wiretap. 18 U.S.C. § 2511(1)(c)-(d). If, however, the jury determines that Sandra was motivated by something other than concern for her child, it will have to evaluate the use and disclosure

---

signed and dated. J.A. at 157, 160. Accordingly, we must consider these declarations when deciding this appeal.

**21.** Similarly, we cannot simply look to Sandra's poor relationship with her daughter and "leap to the conclusion" that Samuel was the cause of the deterioration of that relationship.

**22.** As discussed above, in *Scheib*, the Seventh Circuit permitted parental wiretapping on the "extension exemption" ground.

**23.** We note that summary judgment was also granted for the defendants in *Campbell v. Price*, 2

F.Supp.2d 1186 (E.D.Ark.1998), which was decided subsequent to the district court's opinion in this case. As in *Silas* and *Scheib*, the taping parent in *Campbell*, the child's father, offered evidence to substantiate his claim that the recording of the child's phone conversations was motivated by legitimate concern that the child's relationship with her mother was potentially abusive. *Id.* at 150–51. The child's father submitted an affidavit stating that "his daughter would cry and become upset after talking with her mother on the telephone, that she would 'mope around' and 'go into her room and just sit there' and that she was 'not willing to talk about what was wrong with her.'" *Id.*

claims and determine whether Sandra and her lawyers "knew or should have known" that the communication was the product of an illegal wiretap. *Id.*

There are also questions of fact as to whether Sandra and her attorneys knew that the wiretap itself was potentially illegal. Sandra claims that she did not know the wiretap was potentially illegal,[24] and that as soon as she learned it was, she stopped taping. J.A. at 102–04. Plaintiffs contend that they have a tape (one of Sandra's tapes provided to them by Courtney) on which Sandra has a discussion with another adult woman in which "Sandra goes to great lengths to explain to the other woman that her conversation with Sandra is being tape recorded. Sandra says herself that she is so advising the other woman because Sandra believes it is illegal to tape record telephone conversations without the knowledge of the other person whose call is being recorded." J.A. at 154–55.

As to Sandra's attorneys, Barber and Glidewell, it appears undisputed that these Defendants did use or disclose the contents of these conversations during the course of their representation of Sandra. Whether they knew, or should have known, that the material came from an unlawful wiretap, however, is a question of fact for the jury.[25] *See Thompson*, 838 F.Supp. at 1548 (declining to grant summary judgment as to father's use and disclosure claims against mother's attorneys and stating: "Whether [the attorneys] knew the material came from an unlawful wiretap, ... is a question of fact which this Court may not decide.").

Accordingly, the district court's grant of summary judgment is **REVERSED**, and this case is **REMANDED** for a trial on the disputed issues in this case in accordance with this opinion.

## CONCLUSION

In summary, we **AFFIRM** the district court's adoption of the doctrine of vicarious

consent. as set forth above, **REVERSE** the district court's grant of summary judgment, and **REMAND** this matter for trial.

---

**24.** However, Sandra does concede, as she must, that Courtney was unaware of, and did not consent to, the taping.

**25.** The record does not contain any affidavits from Barber and Glidewell as to what they knew, or did not know, about the recording.