780 A.2d 593 (2001)
344 N.J. Super. 147
Donato A. D'ONOFRIO II, Plaintiff-Respondent,
v.
Cindi A. D'ONOFRIO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 2001.
Decided October 2, 2001.
*594 G. John Germann, Princeton, argued the cause for appellant (DeNoia and Tambasco, attorneys; Mr. Germann, on the brief).
Margaret Goodzeit, Woodbridge, argued the cause for respondent (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Ms. Goodzeit and Cipora Winters, Iselin, on the brief).
Before Judges PRESSLER, CIANCIA and PARRILLO.
The opinion of the court was delivered by PARRILLO, J.A.D.
Defendant Cindi D'Onofrio appeals a final judgment that restricted her rights as joint legal custodian of the parties' four children, awarded her unsupervised parenting time on a specific schedule, and designated plaintiff Donato D'Onofrio as the primary caretaker responsible for making day-to-day decisions regarding the children as well as final decisions on all major issues affecting them where agreement cannot otherwise be reached. Her principal challenge is to the admission of audio tapes of conversations with her children. She claims these conversations *595 were intercepted by plaintiff in violation of the New Jersey Wiretapping and Electronic Surveillance Act (the Wiretap Act), N.J.S.A. 2A:156A-1 to -26, and therefore are suppressible. We have reviewed the record, including the issues and arguments presented on appeal in light of Judge Oles's comprehensive and well-reasoned decision. We affirm.
This bitter custody dispute endured for three years, culminating in a trial that spanned six months and consumed nineteen days from June 18, 1998 to January 12, 1999. It began when the parties separated in March 1996 following an incident between defendant and one of her daughters that left the child hiding in a fetal position in the clothes closet. At the time of this incident, defendant had been under psychiatric care since 1989, suffering from a long history of emotional instability, depression, and suicidal ideation. She had been hospitalized on several occasions. Throughout the pendente lite period, plaintiff remained the primary residential custodian of the couple's four daughters then aged fourteen, eleven, nine, and sevenwhile defendant was permitted visitation on a specific schedule, at times supervised. Dr. Mark White was appointed to provide a custody and parenting analysis.
Problems with visitation arose practically at the outset and, on October 15, 1996, the family court judge appointed Dr. Neil Lavender as the children's guardian ad litem, with authority to mediate visitation disputes. The judge also ordered the parties not to discuss the litigation in front of, or with, their children, and restrained each from disparaging the other. At his initial interview with the children, Dr. Lavender learned from two of them of defendant's vulgar references to their father in their presence and of their objections to seeing their mother. Nevertheless, Dr. Lavender insisted the visitation schedule be followed.
Problems persisted, however, causing stress to the children. The daughter who had secreted herself in the closet, and was being treated for depression, threatened suicide in July 1996. That summer, the children were returned to their father several days later than their scheduled return from an extended August visitation with defendant. In December, Dr. Lavender recommended against increasing defendant's visitation time after conferring with the children's therapist and with defendant's treating psychiatrist. On January 17, 1997, defendant attempted to remove the children from school and, on that same day, Dr. White reported that defendant failed to recognize the impact her actions have had upon her children over the previous six years, and he recommended that plaintiff remain the children's primary custodian.
Dr. Lavender's interim report of February 24, 1997, agreed with Dr. White's assessment, noting further that defendant continued making derogatory remarks about plaintiff, often using profanity, and that the children expressed a clear desire to be with their father. Soon thereafter, defendant's emotional health seemed to deteriorate. She missed several scheduled visits with her children and had not made telephone contact during this time. On April 29, 1997, Dr. Lavender, concerned with the safety of the children, recommended supervised visitation. Unsupervised visitation resumed in May 1997 and continued throughout the summer until September 9, 1997, when defendant, dressed in pajamas, stepped in front of the school van transporting one of her children, tried to stop it, and then chased after it. Two days later, supervised visitation was reinstituted.
Around this time, in March 1997, plaintiff commenced taping telephone conversations between his daughters and *596 defendant, an activity that he says began inadvertently when he left the tape recorder on while defendant and one of their daughters were conversing. The content and tone of that conversation apparently convinced plaintiff to continue taping for approximately eight to ten months thereafter. Judge Oles summarized the seventeen taped conversations admitted at trial thus:
On several occasions she made derogatory comments about Mr. D'Onofrio using vulgar and coarse language directly to her children. On numerous occasions she discussed the litigation directly with her children and made comments about Dr. Lavender, as well as the individuals who were hired by Dr. Lavender and Mr. D'Onofrio to accommodate supervised visitation. This behavior not only was inappropriate but has directly affected the attitude of at least two children in their opinion of their father. It is not necessary for this Court to repeat with detail the nature and the extent of the conversations, but the Court finds that Dr. Lavender's reliance upon those taped conversations to formulate his opinion was most appropriate and substantiates his opinion that Mrs. D'Onofrio's actions were harmful to the children. The use of the coarse language and the denigration of the plaintiff will have a lasting effect upon these children's relationship with their father. The audio tapes further substantiate the fact that Mrs. D'Onofrio has continually placed these children in the middle of this particular divorce. This has caused undue psychological pressure on these children and has greatly interfered with the normal development of their psychological well being.
Plaintiff provided Dr. Lavendar with several of the early tapings prompting the guardian ad litem's recommendation to Judge Oles to continue supervised visitation and permit the future monitoring of telephone conversations between defendant and her children. In any event, from September through Thanksgiving 1997, defendant failed to appear for supervised visitation. In his January 5, 1998 report, Dr. Lavender voiced concern that defendant continued to denigrate plaintiff in front of the children and that her erratic behavior had consistently affected the children's psychological well-being. He reiterated his request for monitoring of defendant's phone calls to her children. A final report of Dr. White, dated June 19, 1998, recommended that plaintiff retain custody of the children and concluded that defendant had "psychopathology on personality disorder level."
Pursuant to N.J.S.A. 9:2-4(c), Judge Oles addressed all relevant statutory criteria in awarding joint legal custody to both parties, designating plaintiff primary caretaker and residential custodian, and permitting defendant unsupervised, albeit scheduled, visitation with the four children. Citing Pascale v. Pascale, 140 N.J. 583, 660 A.2d 485 (1995), Judge Oles stated that his decision conferring rights with less significant responsibilities on defendantthe non-residential custodial parentwas made in light of the best interests of the children.
We consider the issue of the admissibility of the tape recordings against the rather disturbing factual backdrop set forth above. New Jersey's Wiretap Act, and its federal counterpart in Title III of the Federal Omnibus Crime Control and Safe Streets Act (Title III), 18 U.S.C.A. §§ 2510-2521, proscribe the taping of telephone conversations of others, including one's spouse, without consent, when the recording spouse or other interceptor is not a party to the conversation. N.J.S.A. 2A:156A-2, -3; 18 U.S.C.A. §§ 2510, 2511. *597 Such evidence is suppressible in any court proceeding. N.J.S.A. 2A:156A-21; 18 U.S.C.A. § 2515; State v. Robinson, 224 N.J.Super. 495, 499-501, 540 A.2d 1313 (App.Div.1988). Explicitly excepted from these proscriptions are telephone conversations intercepted with the consent of either party to the conversation. N.J.S.A. 2A:156A-4(d); 18 U.S.C.A. § 2511(2)(d).[1] Thus, the taping of one's own telephone conversations with another, while an "intercept" within the meaning of both statutes, N.J.S.A. 2A:156A-2(c); 18 U.S.C.A. § 2510(4); State v. Worthy, 273 N.J.Super. 147, 150-51, 641 A.2d 282 (App.Div.1994), aff'd, 141 N.J. 368, 661 A.2d 1244 (1995); United States v. Turk, 526 F.2d 654 (5th Cir.1976), cert. den., 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), is a violation of neither.
The "consent exception" provision in our Wiretap Act has been interpreted to incorporate "vicarious consent" as well. See State v. Diaz, 308 N.J.Super. 504, 516, 706 A.2d 264 (App.Div.1998); Cacciarelli v. Boniface, 325 N.J.Super. 133, 135-43, 737 A.2d 1170 (Ch.Div.1999). Because children lack the legal capacity to consent, courts have held that a parent or guardian may authorize the recording of his or her minor child's conversations. Id. at 137-40, 737 A.2d 1170. "Vicarious consent" cases are to be distinguished from those that find unlawful and inadmissible the non-consensual recording of conversations intercepted by non-parties between their spouses and third persons who have no knowledge of the interception. See e.g. State v. Lane, 279 N.J.Super. 209, 217-20, 652 A.2d 724 (App.Div.), certif. denied, 141 N.J. 94, 660 A.2d 1193 (1995); Scott v. Scott, 277 N.J.Super. 601, 609-10, 649 A.2d 1372 (Ch.Div.1994). In contrast, in the vicarious consent context, one parent consents to the recording of telephone conversations in his or her home on behalf of one of the parties (the minor child) to the conversation.
To be sure, Diaz involved both parents consenting to the videotaping, with sound recording, in their home of their nine-month old infant with his hired nanny. Diaz, however, relied on federal cases, remarkably similar to the present matter, that interpreted the federal "consent exception" provision virtually identical to ours. Pollock v. Pollock, 154 F.3d 601 (6th Cir.1998), aff'g 975 F.Supp. 974 (W.D.Ky. 1997); Thompson v. Dulaney, 838 F.Supp. 1535 (D.Utah 1993). Given the similarity of language and legislative intent, "we adopt the federal interpretation of the similar federal provision." State v. Diaz, supra, 308 N.J.Super. at 514, 706 A.2d 264.
Both federal cases arose in the context of a lawsuit by a former spouse against the other for recording conversations with the parties' minor child allegedly in violation of Title III. In Pollock, in the course of a bitter custody dispute, the mother taped phone conversations between her fourteen-year old daughter and the daughter's father and stepmother out of concern that the father and stepmother were emotionally *598 abusing her daughter. In affirming the district's court's grant of summary judgment dismissing the Title III action against the plaintiff's former wife, the court relied on Thompson v. Dulaney, supra, a case in which a divorced husband sued his ex-wife for taping his telephone conversations with the former couple's three and five-year old children for purposes of custody proceedings. The Thompson court held that, under the circumstances involving "two minor children whose relationship with their mother/guardian was allegedly being undermined by their father," vicarious consent provided an exception to Title III liability and that under 18 U.S.C.A. § 2511(d)(2), a parent or guardian could authorize the recording of his or her minor children's conversations. 838 F.Supp. at 1544 n. 8.
"Vicarious consent" is bottomed on the need to act in the best interests of the child. It is not, however, a sweeping exemption, and blanket allegations of "best interests" simply will not suffice to render vicarious consent permissible under our Wiretap Act. On the contrary, what is required is a good faith basis that it is objectively reasonable for believing that consent on behalf of the minor to taping is necessary and in the best interest of the child. As the court in Pollock, supra, noted:
[W]e adopt the standard set forth by the District Court in Thompson [v. Dulaney, 838 F.Supp. 1535 (D.Utah 1993)] and hold that as long as the guardian has a good faith, objectively reasonable basis for believing that it is necessary and in the best interest of the child to consent on behalf of his or her minor child to the taping of telephone conversations, the guardian may vicariously consent on behalf of the child to the recording.

[154 F.3d at 610.]
In other words, the situation presented by the other parent, whether it be verbal, emotional, or any other type of abuse, must make it clear that the doctrine of vicarious consent is necessary to protect the child from harm. Ibid.
The circumstances in the present matter are compelling for application of this doctrine. We emphasize several factors. These conversations were recorded for the purpose of custody proceedings whose very goal was to determine the best interests of the D'Onofrios' four children. These conversations were recorded by the residential custodial parent in his own home, well into the pendente lite period during which significant restrictions had already been placed on defendant's interaction with her four daughters due to her history of depression, suicidal tendencies, and hurtful behavior towards them. Supposedly, the taping began inadvertently but deliberately continued after plaintiff overheard defendant speaking to their children in vulgar and obscene terms when referring to him. Indeed, as subsequent tapings revealed, while talking to their daughters, defendant used profanity and crude language, denigrated and demeaned their father, discussed the ongoing custody/divorce litigation, and spoke negatively about the guardian ad litem, Dr. Lavenderall in violation of the court's prior October 15, 1996 order prohibiting this conduct. While the better course would have been for plaintiff to move the court for immediate restraints against such conduct, we are satisfied, as was implicit in the trial court's reasoning, that plaintiff acted out of both a genuine concern for his children's best interests and a good faith, objectively reasonable belief that they were being threatened, intimidated, and verbally abused by their mother, whom he suspected of trying to undermine their relationship with him.
*599 We also sense plaintiff's presumed frustration over the efficacy of yet another court order when others had been violated and when defendant was continuing her wrongful behavior even after it became reasonably apparent that her telephone calls were being recorded. His decision, instead, to continue taping the conversations and thereby gather concrete evidence for a fully informed custody determination was clearly driven by the need to protect the welfare of his children. Under the circumstances, where there is clear evidence of harm to the children, a residential custodial parent's recording in his or her own home of conversations between a minor child and a non-resident parent is permissible under New Jersey's Wiretap Act pursuant to the vicarious consent exemption.
We also note that there was sufficient evidence completely independent of these seventeen tape recordings to support the imposition of conditions and limitations on defendant's joint legal custodial status ordered by Judge Oles. Indeed, Dr. White, the court-appointed custody evaluator, recommended such impositions without benefit of the tapings. Early on, at the outset of his involvement in this matter, Dr. Lavender interviewed the four children and discovered first-hand the impact upon them of their strained and stressful relationship with defendant. He also learned from several of them that defendant spoke derisively and obscenely about their father and that they did not desire to see their mother. Thus, even before the tapings began, on December 6, 1996, Dr. Lavender recommended against holiday parenting time for defendant due to the children's therapist's concern that visitations were causing distress to the children. And, during an interview with Judge Oles, one of the children referred to her father derisively, a notion no doubt planted by the mother's repeated obscene rantings against plaintiff.
This is, by way of example, only some of the evidence, apart from the tapings, relied upon by Judge Oles in his decision vesting plaintiff with greater parental responsibility in the care-taking of the parties' children. There was no mistaken exercise of his discretion in this regard. Indeed, given the overwhelming weight of the evidence against defendant, Judge Oles construed the record liberally in her favor by according her joint legal custodial status.
Defendant next complains that Judge Oles abused his discretion in refusing to allow her expert to testify. Dr. Reskoff was actually defendant's second expert, who was not retained until after the start of the custody trial and over two years into the matrimonial litigation. His expert report was due in August 1998, after two extensions, but was not produced until November 25, 1998, six months into trial and one month after its receipt by defendant's counsel on October 21, 1998; after defendant's counsel represented on November 5, 1998 that she would not call Dr. Reskoff to testify; after plaintiff completed presentation of his case; and only three weeks before the end of trial. Under these circumstances, and given the previous warnings by the trial judge, there was no abuse of discretion in finding defendant's conduct misleading and the admission of such evidence so late in the proceedings prejudicial to plaintiff. See R. 4:17-4(e); R. 4:17-7; R. 4:23-2(b)(2); Russo v. Borough of Carlstadt, 17 N.J. Tax 519, 522-23 (App.Div.1998); Almog v. Israel Travel Advisory Service, Inc., 298 N.J.Super. 145, 161, 689 A.2d 158 (App. Div.1997), appeal dismissed, 152 N.J. 361, 704 A.2d 1297 (1998), cert. denied, Ziemke v. Almog, 525 U.S. 817, 119 S.Ct. 55, 142 L.Ed.2d 42 (1998); Catando v. Sheraton Poste Inn, 249 N.J.Super. 253, 257, 592 *600 A.2d 294 (App.Div.), certif. denied, 127 N.J. 550, 606 A.2d 364 (1991); Ratner v. General Motors Corp., 241 N.J.Super. 197, 202, 574 A.2d 541 (App.Div.1990), Westphal v. Guarino, 163 N.J.Super. 139, 145-46, 394 A.2d 377 (App.Div.), aff'd, o.b., 78 N.J. 308, 394 A.2d 354 (1978).
There was also no abuse of discretion in qualifying Dr. Lavender as a psychological expert, given his extensive credentials, or in allowing him to render a diagnosis of defendant's psychological state (Borderline Personality Disorder) since he monitored defendant's behavior for over two years. In any event, Dr. Lavender had rendered the identical diagnosis in his earlier February 24, 1997 report to the court and counsel.
Lastly, there is no merit to defendant's complaint that Dr. Lavender was improperly allowed to continue as the children's guardian ad litem after the custody trial. Absolutely no bias has been shown. In any event, the guardian's role, post-judgment, could not possibly have any effect on the correctness of Judge Oles's custody decision.
Affirmed.
NOTES
[1] N.J.S.A. 2A:156A-4, in relevant part, provides:

It shall not be unlawful under this act for:
....
d. A person not acting under color of law to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception unless such communication is intercepted or used for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of this State or for the purpose of committing any other injurious act.
[emphasis added]
The language of 18 U.S.C.A. § 2511(2)(d), the federal analogue, is virtually identical.