# DECISIONS

### OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

### COMMONWEALTH vs. F.W.

Middlesex. January 7, 2013. - April 24, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Practice, Criminal,* Motion to suppress. *Evidence,* Wiretap, Sound recording. *Constitutional Law,* Privacy. *Search and Seizure,* Expectation of privacy, Consent. *Privacy. Consent. Child Abuse.*

Discussion of the Federal wiretap statute, 18 U.S.C. § 2511(2)(d) (2006), and the so-called "consent exception" thereto, exempting from liability the interception of conversations with the consent of either of the parties. [6-7]

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress the oral communications in an audiovisual recording of the mute and autistic child victim and the defendant, who was her grandfather, and subsequent statements by the defendant to the police, where, although the defendant had a legitimate expectation of privacy in the bedroom his son occupied in the defendant's home [7-9], the circumstances nonetheless supported the application of the so-called "vicarious consent" doctrine of the consent exception to the Federal wiretap statute, 18 U.S.C. § 2511(2)(d), whereby the victim's adult sibling, a nonparent, acting in good faith and in

the victim's best interest (in that the danger to the child was posed by a parent of the child's parent, and thus a reasonable person in the sibling's position would have had reason to fear that the child's parent would not have acted in the child's best interest to protect the child from actual or potential harm), could safeguard the child by giving vicarious consent to the recording [9-14]; further, the defendant was not entitled to the suppression of his statements to police under the "fruit of the poisonous tree" doctrine, where, in light of the vicarious consent given by the victim's sibling, there was no primary illegality exploited to obtain the defendant's statements [14-15].

INDICTMENTS found and returned in the Superior Court Department on May 13, 2010.

A pretrial motion to suppress evidence was heard by *Leila R. Kern*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Cordy*, J., in the Supreme Judicial Court for the county of Suffolk.

*Charles A. Bookman* for the defendant.

*Jamie Michael Charles*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. This case concerns whether the adult half-sister, Carrie,[1] of a mute and autistic[2] minor child (victim) could vicariously consent under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(2)(d) (2006) (Federal wiretap statute), to the victim's oral communications being intercepted by means of an audiovisual recording[3] intended to gather evidence that the victim's grandfather, the defendant, was sexually abusing her.[4] After being indicted on charges of enticement of a child under the age of sixteen, G. L. c. 265, § 26C;

---

[1] A pseudonym, see G. L. c. 265, § 24C.

[2] Autism is defined as "a mental disorder characterized by severely abnormal development of social interaction and of verbal and nonverbal communication skills. . . . The disorder is probably caused by organically based central nervous system dysfunction, especially in the ability to process social or emotional information or language." Stedman's Medical Dictionary 183-184 (28th ed. 2006).

[3] The defendant did not move to suppress the video portion of the recording because it is well-established that the Federal wiretap statute does not prohibit domestic silent video surveillance. See *United States* v. *Falls*, 34 F.3d 674, 679-680 (8th Cir. 1994); *United States* v. *Koyomejian*, 970 F.2d 536, 540 (9th Cir. 1992).

[4] We do not consider the defendant's conclusory assertion that his oral com-

indecent assault and battery on a child under the age of fourteen, G. L. c. 265, § 13B; assault on a child under the age of sixteen with intent to rape, G. L. c. 265, § 24B; and aggravated rape of a child under the age of sixteen, G. L. c. 265, § 23A (*b*),[5] the defendant moved to suppress the oral communications of the audiovisual recording and subsequent statements he made to police. A Superior Court judge denied the motion after an evidentiary hearing. A single justice of this court allowed the defendant's application for leave to prosecute an interlocutory appeal pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), and ordered the appeal to proceed in this court.[6] Because we conclude that, on the particular facts of this case, Carrie could vicariously consent to the recording of the victim's oral communications, we affirm the denial of the defendant's motion to suppress.

1. *Facts.* We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing.[7] See *Commonwealth* v. *Isaiah*, 448 Mass. 334, 337

---

munications should be suppressed under the Massachusetts wiretap statute, G. L. c. 272, § 99, because it does not rise to the level of acceptable appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Commonwealth* v. *Eberhart*, 461 Mass. 809, 814 n.10 (2012), and cases cited. That said, suppression of these communications, as the defendant concedes, is not mandated under the Massachusetts wiretap statute. See *Commonwealth* v. *Santoro*, 406 Mass. 421, 423 (1990).

[5]A Middlesex County grand jury also returned indictments charging the defendant with two offenses against Carrie (over a six-year period from 1990 to 1996) including assault on a child under the age of sixteen with intent to rape, G. L. c. 265, § 24B, and forcible rape of a child under the age of sixteen, G. L. c. 265, § 22A.

[6]In pursuing his appeal, the defendant neglected to file a notice of appeal in the trial court and did not timely file his application for leave to file an interlocutory appeal, see Mass. R. Crim. P. 15 (b) (1), as appearing in 422 Mass. 1501 (1996) ("An application for leave to appeal under subdivision [a] [2] shall be made by filing within ten days of the issuance of notice of the order being appealed, or such additional time as either the trial judge or the single justice of the Supreme Judicial Court shall order"). Although the Commonwealth raised both of these issues in the county court, the Commonwealth does not assert the challenges here. In the circumstances, and in view of the significance of the issue underlying the interlocutory appeal, we decline to comment on the procedural propriety of the appeal.

[7]Two witnesses testified on behalf of the Commonwealth at the evidentiary hearing: Carrie, who first waived her right against self-incrimination under the Fifth Amendment to the United States Constitution; and Detective Lieutenant Paul Norton of the Melrose police department.

(2007), and cases cited. The defendant's son has two daughters by different mothers: the victim, who is autistic and mute,[8] and Carrie, the victim's older half-sister. The defendant's son lived in a room at the defendant's home in Melrose. When the victim was with her father,[9] she would spend most of her time in his bedroom watching television and movies.

Carrie claimed that, while visiting her father at the defendant's home when she was between three and fourteen years of age, the defendant repeatedly inappropriately touched her. When she was thirteen or fourteen years of age, Carrie informed her grandmother, the defendant's wife who lived with him, about the defendant's actions. Carrie testified that the touching "would stop for about three days, and then continued on." Eventually Carrie decided to "stay away" from her father's family. When she was nineteen years of age, however, Carrie decided to see her father's family again.

In February, 2010, near the victim's twelfth birthday, Carrie, then twenty-seven years of age, noticed changes in the victim's temperament and behavior. The victim, who ordinarily was happy, which was exhibited by her smiles and laughter, suddenly was crying a lot and was tensing her body. Carrie suspected that the changes in the victim's behavior were due to the defendant sexually abusing her.

On March 21, 2010, Carrie set up a hidden video camera in the bedroom used by her father in the defendant's home, aiming the camera at the bed.[10] Carrie left the video camera recording for approximately six hours, during which time the victim was periodically alone with the defendant and her grandmother.[11] That evening, after retrieving the video camera and watching the video recording,[12] Carrie went to the Melrose police depart-

---

[8]The victim communicates through tapping and pointing.

[9]The victim would regularly visit her father at the defendant's home. At some unspecified time, the victim's father and mother had separated.

[10]Carrie testified that she did not tell anyone in the family about her concerns before making the recording because, "[W]hen I did say something about the [defendant's] behavior that was happening when I was younger, nothing was done about it. And I needed to make sure that I had enough proof to make sure that [the victim] was safe."

[11]Carrie left the house with her father to do errands, returned briefly to the house and then departed, by herself, shortly thereafter.

[12]In her findings, the judge characterized the content of the recording: "The

ment to report her belief that the defendant had sexually abused the victim. Carrie spoke with Detective Lieutenant Paul Norton. She informed him of what her grandfather allegedly had done to her in the past and that she had set up the video camera because she suspected that he might be sexually assaulting the victim. When they finished meeting, Carrie went home and transferred the video recording onto six digital video discs (DVDs), which she delivered to the police station the next day.

On March 23, after viewing the DVDs, Detective Lieutenant Norton called the defendant and asked him to come to the police station. The defendant promptly complied and on his arrival was escorted into an interview room where Norton, in the presence of another detective, read him the Miranda warnings from a form. The defendant signed the form, indicating that he understood his rights.

Norton asked the defendant about his relationship with Carrie and whether he had ever sexually abused her. The defendant responded that he used to "play rough" with Carrie and may have "patted her on the ass before," but that he never touched her inappropriately. Turning to the defendant's relationship with the victim, Norton asked the defendant what he would say if, hypothetically, Norton had an audio and video recording of the defendant in the room with the victim. Norton proceeded to inform the defendant that this "video" hypothetically showed the defendant walking up, undoing his zipper, and taking his right hand and putting it around the back of the victim's head saying, "Put it in your mouth." The defendant said, "I did wrong," and that he "had just wanted to see what she would do and got carried away." The defendant added that he usually kisses the victim and again, that he "got carried away." He also admitted that "it" had happened before, namely, during the

_____

[recording] showed the defendant unzipping his pants while walking into the bedroom where [the victim] was watching movies. The defendant could be heard on the recording repeatedly instructing [the victim] to 'put it in your mouth.' The defendant was also seen in the recording placing his hand over [the victim's] head and directing her head towards his groin. At this time, and on other occasions outside of the camera's viewing, sucking/slurping noises could be heard. At times, [the victim] could also be seen moving her head in a downward motion." Based on our review of the recording, this description is accurate. We add that when the defendant told the victim to "put it in your mouth," he did so in a whisper.

week of the victim's birthday. Norton ended the interview and placed the defendant under arrest.

2. *Discussion.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). The defendant argues that the judge should have suppressed the audio portion of the recording under the Federal wiretap statute. A brief overview of the statute is in order.

The Federal wiretap statute, as relevant here, "makes it a crime, except in limited circumstances, to intentionally intercept [an oral communication] or to intentionally disclose the contents of such a communication." *Commonwealth* v. *Damiano,* 444 Mass. 444, 447 (2005), quoting 18 U.S.C. § 2511. In addition to providing criminal penalties for violations of the statute, see 18 U.S.C. § 2511(4)(a) (2006) (violators "shall be fined . . . or imprisoned not more than five years, or both"), the statute also provides civil remedies for any person whose oral communication was intercepted, see *id.* at § 2520(a) & (b) (2006). Further, the statute contains an exclusionary rule provision, "prohibit[ing] the admission in evidence of unlawfully intercepted 'wire' or 'oral' (but not 'electronic') communications, and evidence derived therefrom." *Commonwealth* v. *Damiano,* *supra* at 447-448. See 18 U.S.C. § 2515 (2006).

An "oral communication" under the Federal wiretap statute is defined as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." See 18 U.S.C. § 2510(2) (2006). Thus, a defendant "seeking to suppress a recording [must show that he] had a legitimate expectation of privacy when he made the recorded statements." *Commonwealth* v. *Rivera,* 445 Mass. 119, 128 (2005), citing 18 U.S.C. § 2510(2). "In determining whether a defendant has made the requisite showing, courts apply the familiar standards of the Fourth Amendment to the United States Constitution." *Id.*

"Conversations intercepted with the consent of either of the parties are explicitly exempted from Title III liability." *Pollock* v. *Pollock*, 154 F.3d 601, 606 (6th Cir. 1998). Under the so-called "consent exception":

> "It shall not be unlawful . . . for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

18 U.S.C. § 2511(2)(d) (2006) (consent exception).

a. *Legitimate expectation of privacy.* The Commonwealth argues that no unlawful interception occurred under the Federal wiretap statute because the defendant had no legitimate expectation of privacy either in the location the recording occurred or in the content of his statements that were recorded. See *Commonwealth* v. *Rivera, supra.* We disagree.

The Commonwealth first asserts that the defendant did not have a reasonable expectation of privacy in his son's bedroom, adding that the defendant did not even lock the bedroom door at the time of the recording. This fact, however, does not mandate a conclusion that the defendant lacked a legitimate expectation of privacy in the room. Contrary to the Commonwealth's suggestion, the record does not establish that the defendant's son "had exclusive access and control" over his bedroom. The Commonwealth ignores the fact that the defendant's son had left the house with Carrie without limiting his father's access to his room. Significantly, the record contains no information concerning the son's arrangement with his parents to use a room in their home, whether he paid rent to do so, or even if there was a means to lock it. In these circumstances, there is no reason to depart from the express mandate set forth in our Federal and State Constitutions that "every person has the right to be secure against unreasonable searches and seizures in his home." *Commonwealth* v. *Porter P.*, 456 Mass. 254, 260 (2010). See Fourth Amendment to the United States Constitution ("The

right of the people to be secure in their persons, *houses*, papers and effects, against unreasonable searches and seizures, shall not be violated . . ." [emphasis added]); art. 14 of the Massachusetts Declaration of Rights ("Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his *houses*, his papers, and all his possessions" [emphasis added]); *Payton* v. *New York*, 445 U.S. 573, 585 (1980), quoting *Boyd* v. *United States*, 116 U.S. 616, 630 (1886) (Fourth Amendment "appl[ies] to all invasions [by] government of the sanctity of a man's home"). We conclude that the defendant had a legitimate expectation of privacy in the bedroom his son occupied in his (the defendant's) home. See *United States* v. *$40,995.00 in United States Currency*, 554 F.3d 752, 754, 757 (9th Cir.), cert. denied sub nom. *El Farra* v. *United States*, 558 U.S. 895 (2009) (concluding that "uncontested declarations of ownership and occupancy established [parents'] expectations of privacy in the entire home, which included [defendant's] bedroom").

Relying on *Bartnicki* v. *Vopper*, 532 U.S. 514 (2001), the Commonwealth contends that the defendant "enjoys little to no legitimate expectation of privacy in statements concerning his . . . [subjugation] of a minor child to physical or sexual abuse." The *Bartnicki* decision, however, is factually distinguishable from this case. In *Bartnicki, supra* at 518-519, the United States Supreme Court was not concerned with the admissibility of an illegally intercepted communication, but rather with the liability of a radio commentator and a citizen who were given the tape of an illegally intercepted conversation, made during contentious collective bargaining negotiations, between the president of a teachers' union and the union's chief negotiator. The radio commentator and citizen separately published the content of the tape, which contained the union president's threat to "blow off" the "front porches" of school board members. *Id.* Where the publishers of the threat had not unlawfully obtained the information, the Court concluded that because the intercepted speech was "unquestionably a matter of public concern, and [the press] were clearly engaged in a debate about that concern," the First Amendment to the United States Constitution prohibited recovery of damages against them. *Id.* at 517-518, 525, 535. In his concurring opinion, Justice Breyer noted that "[w]here publication of

private information constitutes a wrongful act, the law recognizes a privilege allowing the reporting of threats to public safety." *Id.* at 539 (Breyer, J., concurring). This language, however, must be viewed in context with the facts of the *Bartnicki* case. Here, we are not concerned with a public threat and our decision involves the admissibility of the oral communications of the recording, not the liability of Carrie for publishing its content to police. The *Bartnicki* decision simply does not apply in determining whether the defendant had a legitimate expectation of privacy when he made the recorded statements.

b. *Vicarious consent exception.* The Commonwealth argues that the vicarious consent doctrine of the consent exception applies in this case and therefore the audio portion of the recording is admissible. The consent provision of the Federal wiretap statute has been interpreted to allow a parent or guardian, acting to protect the welfare of his or her child or children, to vicariously consent to the recording of the child's conversations with another. See *Thompson* v. *Dulaney*, 838 F. Supp. 1535, 1543-1544 (D. Utah 1993). The United States District Court for the District of Utah was the first Federal court to adopt the doctrine of vicarious consent and did so in the context of custody proceedings where one parent recorded the other parent's conversations with the couple's two minor children, then three and five years of age. *Id.* at 1537. The court held:

> "[A]s long as the guardian has a good faith basis that is objectionably reasonable for believing that it is necessary to consent on behalf of her minor children to the taping of the phone conversations, vicarious consent will be permissible in order for the guardian to fulfill her statutory mandate to act in the best interests of the children."

*Id.* at 1544. The court cautioned that its holding was "very narrow" and "limited" to its facts. *Id.* at 1544 n.8. Other Federal courts have adopted the vicarious consent doctrine.[13] See *Pollock* v. *Pollock*, 154 F.3d 601, 610 (6th Cir. 1998); *March* v.

---

[13]Some Federal courts have broadly interpreted the so-called "extension telephone exemption" under 18 U.S.C. § 2510(5)(a)(i) (2006) to permit a parent to record a conversation of a minor child from an extension telephone within the home. See *Scheib* v. *Grant*, 22 F.3d 149, 154 (7th Cir.), cert.

*Levine*, 136 F. Supp. 2d 831, 848 n.39 (M.D. Tenn. 2000), cert. denied, 534 U.S. 1080 (2002); *Wagner* v. *Wagner*, 64 F. Supp. 2d 895, 896 (D. Minn. 1999); *Campbell* v. *Price*, 2 F. Supp. 2d 1186, 1191 (E.D. Ark. 1998). The fundamental premise for applying the doctrine is that there are compelling circumstances making it "necessary to protect [a] child from harm." *Pollock* v. *Pollock*, *supra*.

Many State courts also have adopted the vicarious consent doctrine either under the consent exception of the Federal wiretap statute, or under the cognate provision of their State wiretapping statute. See, e.g., *State* v. *Whitner*, 399 S.C. 547, 554 (2012) (adopting vicarious consent doctrine under State wiretap statute that was patterned on Federal wiretap statute); *State* v. *Spencer*, 737 N.W.2d 124, 132 (Iowa 2007) (permitting, under State wiretap statute, parents to vicariously consent for minor); *State* v. *Diaz*, 308 N.J. Super. 504, 510, 516 (1998) (under State wiretap statute, which was "substantially similar" to Federal wiretap statute, parents could vicariously consent to recording involving their infant child who was being physically abused by nanny). Without specifying which exemption applied, the Appeals Court addressed this issue and concluded that "a recording by parents of their own minor son talking on the telephone in their own home, motivated by concerns that he was being sexually exploited by an adult," was not illegal under the Federal wiretap statute.[14] *Commonwealth* v. *Barboza*, 54 Mass. App. Ct. 99, 107, cert. denied, 537 U.S. 887 (2002).

denied, 513 U.S. 929 (1994); *Newcomb* v. *Ingle*, 944 F.2d 1534, 1536 (10th Cir. 1991), cert. denied, 502 U.S. 1044 (1992); *Anonymous* v. *Anonymous*, 558 F.2d 677, 679 (2d Cir. 1977). These decisions have supported the adoption of the vicarious consent doctrine. See, e.g., *Pollock* v. *Pollock*, 154 F.3d 601, 610 (6th Cir. 1997) ("while these cases address the question from a different perspective . . . the end result — that these kinds of wiretaps should be permitted in certain instances — supports adoption of [the vicarious consent] doctrine"). See *Scheib* v. *Grant*, *supra* ("We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for that child's well-being").

[14]A minority of courts addressing the issue have declined to adopt the vicarious consent doctrine. See *State* v. *Christensen*, 153 Wash. 2d 186, 193-194 (2004) (declining to adopt doctrine where State wiretapping statute requires consent of all parties to conversation); *West Virginia Dep't of Health & Human Resources* v. *David L.*, 192 W. Va. 663, 669 (1994) (declining to adopt vicarious consent doctrine where husband, living apart from wife, procured

Were the victim's father the person who made the recording at issue here, we would not hesitate to apply the vicarious consent doctrine. We are confronted, however, with an issue of first impression, namely, whether to interpret the vicarious consent doctrine to allow a nonparent, and specifically, the adult half-sister of the victim, to vicariously consent to the oral communications of her half-sister. We know of no Federal or State court that has interpreted the vicarious consent doctrine in this manner; conversely, we know of no court that has been asked to do so and refused. The circumstances of this case support application of the doctrine.

We first point out that the defendant does not challenge the fact that the victim was incapable of providing consent. Nor does he contest that Carrie was acting at all times to protect her half-sister, that she was acting in the victim's best interests, or that Carrie had a good faith basis for doing so. Thus, if Carrie were a parent or a legal guardian of the victim, there would be no doubt that application of the vicarious consent doctrine would be appropriate in this case.

When we speak of child welfare, we generally speak in terms of a *parent's* duty to act in the best interest of his or her child. See *Blixt* v. *Blixt*, 437 Mass. 649, 657 (2002), cert. denied, 537 U.S. 1189 (2003) (*Blixt*) ("best interests of the child" standard "has long been used in Massachusetts to decide issues of custody and visitation and other issues relating to child welfare"). See also *Bellotti* v. *Baird*, 443 U.S. 622, 635, 639 (1979) (parents have duty to protect their child because children "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them"). A fundamental right of parental autonomy rests "on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Troxel* v. *Granville*, 530 U.S. 57, 68 (2000), quoting *Parham* v. *J.R.*, 442 U.S. 584, 602 (1979).

---

third party to tape conversations between wife and their children in wife's home); *State* v. *Shaw*, 103 N.C. App. 268, 272 (1991) (declining to adopt vicarious consent doctrine).

"Parental rights, however, are not absolute." *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 832, cert. denied, 528 U.S. 1005 (1999). "It cannot be disputed that the State has a compelling interest to protect children from actual or potential harm." *Blixt, supra* at 656, and cases cited. See *Globe Newspaper Co.* v. *Superior Court for Norfolk County*, 457 U.S. 596, 607-608 (1982) ("safeguarding the physical and psychological well-being of a minor" constitutes "compelling" State interest). "This interest is expressed in a variety of statutes and proceedings, ranging from the complete severance of parental rights on a judge's finding of parental unfitness, to the limitation of parental choices in the areas, for example, of education, health care, and safety" (footnotes omitted). *Blixt, supra.* See *Sher* v. *Desmond*, 70 Mass. App. Ct. 270, 283-284 (2007) (possibility of ongoing physical abuse and pattern of isolating child from family warranted grandparent visitation to protect child from further significant harm).

Significantly, the State has not reserved exclusively either to itself or to parents the duty to protect children and to prevent harm (or further harm) to children. For example, certain individuals who work with children or who come into contact with children by virtue of their employment, who "ha[ve] reasonable cause to believe that a child is suffering from physical or emotional injury resulting from . . . sexual abuse," are required, hence are "mandated reporters,"[15] to notify the Department of Children and Families (department). See G. L. c. 119,

---

[15] A "[m]andated reporter" is "a person who is: (i) a physician, medical intern, hospital personnel engaged in the examination, care or treatment of persons, medical examiner, psychologist, emergency medical technician, dentist, nurse, chiropractor, podiatrist, optometrist, osteopath, allied mental health and human services professional licensed under [G. L. c. 112, § 165], drug and alcoholism counselor, psychiatrist or clinical social worker; (ii) a public or private school teacher, educational administrator, guidance or family counselor, child care worker, person paid to care for or work with a child in any public or private facility, or home or program funded by the [c]ommonwealth or licensed under [G. L. c. 15D] that provides child care or residential services to children or that provides the services of child care resource and referral agencies, voucher management agencies or family child care systems or child care food programs, licensor of the department of early education and care or school attendance officer; (iii) a probation officer, clerk-magistrate of a district court, parole officer, social worker, foster parent, firefighter, police officer; (iv) a priest, rabbi, clergy member, ordained or licensed

§ 51A (*a*). Indeed, "[a]ny person may file a report [with the department] if that person has reasonable cause to believe that a child is suffering from . . . abuse or neglect." *Id.* at § 51A (*f*). There are no parental notification requirements imposed on anyone before filing a report. If a report is made in "good faith" and "the reporter did not cause the [reported] abuse or neglect," the reporter, whether it be a mandated reporter or any "other person," will not be "liable in any civil or criminal action for filing [the] report." *Id.* at § 51 (*g*).

In this case, we turn to these principles because the Federal wiretap statute is silent on the issue before us and traditionally issues of child protection have been matters left to the States. See *Elk Grove Unified Sch. Dist.* v. *Newdow*, 542 U.S. 1, 13 (2004) ("in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the [S]tate courts"); *Thompson* v. *Thompson*, 484 U.S. 174, 186 n.4 (1988) (United States Supreme Court traditionally reserves "domestic relation matters to the [S]tates"). See also *Bellotti* v. *Baird, supra* at 639, quoting *Ginsberg* v. *New York*, 390 U.S. 629, 639 (1968) ("Under the Constitution, the State can 'properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility' ").

Here, the record is silent as to what, if any knowledge the victim's father may have had concerning the sexual abuse of the victim.[16] We are not confident in the circumstances of this case that the "natural bonds of affection," *Troxel* v. *Granville, supra*, necessarily would have motivated him to act in the victim's

minister, leader of any church or religious body, accredited Christian Science practitioner, person performing official duties on behalf of a church or religious body that are recognized as the duties of a priest, rabbi, clergy, ordained or licensed minister, leader of any church or religious body, accredited Christian Science practitioner, or person employed by a church or religious body to supervise, educate, coach, train or counsel a child on a regular basis; (v) in charge of a medical or other public or private institution, school or facility or that person's designated agent; or (vi) the child advocate." G. L. c. 119, § 21.

[16]Had the victim's father learned of the defendant's sexual abuse of the victim and done nothing to attempt to protect her, he could face criminal charges. See G. L. c. 265, § 13L ("Whoever wantonly or recklessly engages in conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished . . .").

best interests on learning of the abuse. We say this because he would have faced conflicting loyalties between protecting his daughter, the victim, and protecting his own father, the defendant. Assuming, however, that the victim's father did not know of the sexual abuse, the abuse continued[17] and the victim, because of her autism, was unable physically to disclose the occurrence of that sexual abuse to her father. Without intervention, the sexual abuse may very well have occurred again. In these circumstances, it was understandable, and objectively reasonable, that Carrie sought to act on behalf of the victim in order to protect her from actual and substantial physical and emotional harm. In view of the policy to afford minors "a unique and protected status," see *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 132 (1983), and also to protect those with disabilities from abuse, see *Cooney* v. *Department of Mental Retardation*, 52 Mass. App. Ct. 378, 382-383 (2001), we conclude that where there is an adult sibling who is acting in good faith and in the best interests of a child, where the danger to the child is posed by a parent of the child's parent, and where, for that reason, a reasonable person in the sibling's position would have reason to fear that the child's parent may not act in the best interest of the child to protect the child from actual or potential harm, then the adult sibling may safeguard the child by giving vicarious consent. Our conclusion is consistent with the State's "compelling interest in protecting children from actual or potential harm," *Blixt*, *supra* at 656, to which the privacy interests of the grandfather must yield. We cannot imagine that Congress would not similarly embrace such a policy. Indeed, were we to hold to the contrary, Carrie would be subject to criminal prosecution, a result that we do not believe Congress intended. See *Scheib* v. *Grant*, 22 F.3d 149, 154 (7th Cir.), cert. denied, 513 U.S. 929 (1994) ("We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for that child's well-being").

One final matter must be addressed. The defendant contends that his statements to police should be suppressed under the

---

[17]Based on the defendant's statements to police, the incident that was recorded by Carrie was not the first time the defendant had sexually abused the victim.

"fruit of the poisonous tree" doctrine set forth in *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963). We reject this argument because Carrie vicariously consented to the recording in accordance with 18 U.S.C. § 2511(2)(d), thus there was no "primary illegality" to exploit in order to obtain the defendant's statements. *Id.* at 488, quoting Maguire, Evidence of Guilt 221 (1959).

3. *Conclusion.* The motion to suppress was properly denied. The order denying motion to suppress is affirmed.

*So ordered.*