Filed 8/14/17

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re TREVER P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | F073691 |
| Plaintiff and Respondent, | (Super. Ct. No. JJD069610) |
| v. | |
| TREVER P., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Tulare County. Robert Anthony Fultz, Judge.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kevin M. Cornwall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

Trever P., 12 years old at the time of the offenses, was found by the juvenile court to have committed acts of sexual molestation against his four-year-old cousin while babysitting him one day. The court committed Trever to the Division of Juvenile Justice (DJJ).

In this appeal, Trever argues that the primary evidence against him—an audio recording, surreptitiously made by the victim's mother, of the conversation Trever and the victim had during the offenses—was inadmissible. He says Penal Code section 632,[1] a part of the Invasion of Privacy Act, barred admission of the recording. We agree with the trial court's conclusion that the evidence was admissible under an exception in section 633.5. The exception allows admission of a surreptitious recording if one party consents to being recorded for the purpose of obtaining evidence of certain specified crimes. The victim's mother reasonably suspected such a crime when she arranged to make the recording. She was not a party to the conversation, but, as we will explain, section 633.5 is properly construed as allowing a parent to consent on behalf of a child under circumstances like these. In so holding, we adopt reasoning applied in several other jurisdictions.

The People contend that, in addition to this vicarious parental consent doctrine, the recording was admissible because the exclusionary provision of section 632 was abrogated by the provision of the California Constitution known as the truth in evidence rule (Cal. Const., art. I, § 28, subd. (f)(2)), enacted by the voters as part of Proposition 8 in 1982. It is unnecessary to address this contention. We rely only on the parental consent analysis.

Trever also argues that the trial court abused its discretion by committing him to DJJ. In the unpublished portion of this opinion, we disagree. The judgment will be affirmed.

---

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

## FACTS AND PROCEDURAL HISTORY

Kim was the mother of the victim, Ralph. Kim and Ralph lived with Kim's boyfriend in a trailer. On June 10, 2015, Trever came to the trailer to babysit Ralph alone while Kim and the boyfriend were at work. Ralph was happy and excited to see his cousin. When Trever returned the following day to babysit again, however, Ralph cried and said he did not want Kim to leave. Ralph said he was afraid Trever would leave him alone in the trailer. By that evening, Kim was worried that Trever could be verbally abusing Ralph, hitting him, or leaving him alone. She decided that the following day (June 12, 2015), before Trever came back, she would turn on her cell phone's recording function and conceal the phone in a cupboard, in the hope that the secret recording might show whether Trever was mistreating Ralph. Trever was with Ralph from 4:00 p.m. to 10:00 p.m. that day.

The recording, which we will describe in more detail below, included about two and a half hours of this period. On it, Trever's voice can be heard ordering Ralph to submit to numerous sex acts as Ralph says it hurts and tells Trever to stop.

Based on the events reflected in the recording, the district attorney filed a juvenile wardship petition alleging the following nine counts: (1) forcible sodomy against a victim under age 14 (§ 286, subd. (c)(2)(B)); (2) lewd act against a child (§ 288, subd. (a)); (3) forcible oral copulation (§ 288a, subd. (c)(2)(A)); (4) sexual penetration with a foreign object of a victim under age 14 (§ 289, subd. (a)(1)(B)); (5 through 7) three forcible lewd acts against a victim under age 14 (§ 288, subd. (b)(1)); (8) sodomy against a child under age 14 and seven or more years younger than the perpetrator (§ 269, subd. (a)(3)); and (9) oral copulation of a child under age 14 and seven or more years younger than the perpetrator (§ 269, subd. (a)(4)).

Before the jurisdictional hearing, Trever filed a motion in limine to exclude the recording from evidence. He argued that the recording was made inadmissible by section 632 and asked the court to consider dismissing the petition because there was virtually no

3.

other evidence of the offenses. The People argued that the recording was admissible under the section 633.5 exception.

Section 632 makes it a criminal offense to use a device "to eavesdrop upon or record" a "confidential communication" without "the consent of all parties" to the communication. (§ 632, subd. (a).) Except to prove a violation of section 632 itself, evidence obtained in violation of the section "is not admissible in any judicial, administrative, legislative, or other proceeding." (§ 632, subd. (d).) Section 633.5 provides an exception according to which one party to a confidential communication is permitted to record the communication secretly "for the purpose of obtaining evidence reasonably believed to relate to the commission by any other party to the communication" of certain crimes, including "any felony involving violence against the person."

The court held a hearing on the motion. Kim testified and recounted the facts described above about her decision to make the surreptitious recording. On the first day of babysitting, before Kim went to work, Ralph was "excited and happy to see his cousin. There was no problem." On the second day, Ralph was "crying and telling me he didn't want me to go to work." He was "saying that [Trever] said he is going to leave me all alone." That night, Kim decided that the next day she would leave her "recorder on to see what [Trever] was doing. To see if [Trever] was leaving him inside and going outside and playing or if he was just being mean to him." Kim "didn't know what was going on." She said, "Something was going on, though." The prosecutor asked if Kim was "concerned if your son was being mistreated." Kim answered, "I was concerned that [Trever] was either verbally abusing him or maybe hitting him. That's it." She believed Trever might be hurting Ralph. On cross-examination, Kim said Ralph was "acting terrified" about being left with Trever, and Trever had been threatening to leave him alone. Ralph "had issues with" being left alone.

4.

The juvenile court held another hearing at which it stated a tentative ruling that the recording was admissible under the section 633.5 exception. Acknowledging that no party to the conversation actually consented to the recording, the court accepted the People's invitation to embrace vicarious consent doctrine. Trever argued that Kim's testimony indicated that Ralph only said he was afraid Trever would leave him and Kim was only guessing when she thought Trever might be hitting Ralph At least implicitly, this amounted to an argument that, in addition to the lack of consent by any party to the conversation, the evidence was also inadmissible because Kim did not have a reasonable belief that the recording would obtain evidence of a felony involving violence. The court, however, found that Kim had a sufficient basis to trigger the section 633.5 exception. The People also argued that the truth in evidence rule made the evidence admissible, but the court declined to decide that issue. At the end of the hearing, the court confirmed its tentative ruling.

At the jurisdictional hearing, the recording and a transcript were admitted into evidence. The transcript began with Ralph crying and expressing distress about Kim leaving for work. Kim's boyfriend started out trying to console Ralph, saying, "You're gonna be all right. You're supposed to miss her. That's a good thing. . . . She misses you too." But after a while he threatened to spank Ralph and finally said "I swear I will whip the shit out of you already." The boyfriend also told Ralph, "Trever's gonna be nice to you, because if not I'm gonna whoop his f****n' ass right in front of you and you can watch it, okay?"

After Kim and the boyfriend left, the following exchange occurred:

"[Trever]:   . . . Get up. (Unintelligible). Does that hurt?

"[Ralph]:   (No.)[2]

---

**2**    Some words are shown in the transcript in parentheses. The transcript does not explain the significance of the parentheses.

"[Trever]: Open up (your butthole). (Unintelligible). Come here. I'm gonna lay down. I want you to sit your butthole (unintelligible). Now. . .

"[Ralph]: (Sit on here.)

"[Trever]: Yes, (do it). No, the other way (facing me).

"[Ralph]: This way?

"[Trever]: Yeah, sit down. No, (sit) like this. Put one leg over. Come here. Put one leg over me now (unintelligible). Wait—wait. Stand up. Here (unintelligible) (want you to stand right here and go like this. (Move your ass all the way over). Sit down (here now). Here, stand on the steps and do it. (Unintelligible). Come on. Do it right.

"[Ralph]: Like this?

"[Trever]: No, like this. Look, all right (watch me). Bend over and open it up all the way grab (here, go like that), okay? Hold on. Does it hurt? Yeah?

"[Ralph] No. Ow, that hurts.

"[Trever]: Stop.

"[Ralph]: That hurts.

"[Trever]: Bend over now. Wait (unintelligible). Now (unintelligible). Hold on.

"[Ralph]: Ow.

"[Trever]: Stop. I just had it in there. Now. . .

"[Ralph]: (No—now).

"[Trever]: Now, one more time—one more time—one more time.

"[Ralph]: (Owie).

"[Trever]: One more time.

"[Ralph]: I don't want to do (one that again).

"[Trever]: One more time. One more time and that's it, come on.

"[Ralph]: (Are you gonna hurt me?)

"[Trever]: I won't. Just do it. No, get on the first step like I told you to.

"[Ralph]: This step?

"[Trever]: Yes. And when I do—when I stick it in I want you to say ah-ah, okay?

"[Ralph]:       Oh, that. . .

"[Trever]:      Stop.

"[Ralph]:       That hurts—that hurts.

"[Trever]:      Wait—wait, no.

"[Ralph]:       No.

"[Trever]:      (I'm doing) it now.  (It wasn't working).  Now do it.
                Remember what I told you to say.

"[Ralph]:       Ow, that hurts.

"[Trever]:      Keep it—keep it now.

"[Ralph]:       No, that hurts—that hurts.

"[Trever]:      Now.

"[Ralph]:       (You're hurting me).

"[Trever]:      It's supposed to hurt."

The transcript contains many similar passages.  Because the facts of the offenses are not in dispute, one more example will suffice to illustrate the nature of the conduct:

"[Trever]:      One more time.

"[Ralph]:       Please don't do it.  (It hurts.)

"[Trever]:      Stand up on the step now.  I'm gonna stick it in you.  Don't
                move.  Don't even cry.  If you cry, I'm never takin' you to
                see your mom again.  Bend over.  No.  Stand up and bend
                over.  Okay, there you go.  Now stop.

"[Ralph]:       Ow.

"[Trever]:      (Suck on it).

"[Ralph]:       (Unintelligible).

"[Trever]:      Now suck it.  Suck it.  Suck it now.

"[Ralph]:       (Unintelligible).

"[Trever]:      Suck it.  You want—you want me to shove it in there again?
                Then suck it."

Trever told Ralph never to tell his mother what Trever did to him, and said Ralph would never see his mother again if he told her.

7.

Detective Joseph Henderson of the Merced Police Department testified that he contacted Trever to execute an arrest warrant. He read and explained *Miranda*[3] warnings to Trever. Henderson believed Trever understood the warnings. When Henderson asked whether Trever would give up his rights and be interviewed by Henderson, Trever said no. Henderson asked no more questions. Afterward, Trever rode to Merced with Henderson in a police car. They discussed a variety of subjects, including football and music. Henderson's impression was that Trever was intelligent, happy, and "reasonable to get along with."

The transcript of Kim's testimony at the hearing on the motion in limine was admitted into evidence at the jurisdictional hearing. The parties stipulated that a doctor examined Ralph and found no signs of trauma, but would testify that because of the passage of time, it would not be abnormal for any signs of trauma to have disappeared before the examination.

The court found by clear and convincing evidence that Trever knew the wrongfulness of the conduct and thus was capable of committing the crimes within the meaning of section 26, despite being below age 14. Turning to the offenses, the court found that Ralph was under age 14 and was very young, but that his exact age was not proved beyond a reasonable doubt,[4] so it was not established that Trever was seven or more years older than Ralph. The court found counts 8 and 9 not proven because they required proof that the victim was seven or more years younger than the perpetrator. It also found count 1 not proven because the recording did not make clear that the object with which Trever was penetrating Ralph's anus was Trever's penis, although it "probably" was. The court found the remaining counts true beyond a reasonable doubt.

---

**3**      *Miranda v. Arizona* (1966) 384 U.S. 436.

**4**      Statements that Ralph was four years old are found in the probation report and the report of the psychological evaluator.

Regarding the evidence, the court stated:

"I have to say this tape recording, Exhibit 2, is some of the most sickening evidence I've heard. I have presided over adult jury trials involving murders with gory evidence and sexual abuse cases with horrific testimony from the victims, but actually hearing the acts being committed, as is the case here, and Trever's callous and sadistic treatment of Ralph is very disturbing. He seems to take pleasure out of hurting Ralph, and threatening to leave him and spanking him. [¶] There are numerous instances of Trever telling Ralph to bend over and open his butt, that he was going to stick it in, and for Ralph to keep it in; and to do it just one more time, over and over; or requesting Ralph to 'suck it' and threaten[ing] to leave him alone if he didn't and even threatening to kill him."

In determining the maximum total confinement time, the court found each count was a separate occasion. "[T]here were breaks between the acts committed, and [Trever] did have time to reflect upon his actions." The court found the maximum time to be 52 years, calculated as follows: On count 2, two years; on count 3, eight years; on count 4, 12 years; on counts 5, 6 and 7, 10 years each.

Finally, the court ordered the case transferred from Merced County to Tulare County for the disposition hearing. It found that Trever's legal residence was in Tulare County, that his father and grandfather lived there, and that the transfer would be in his best interest.

At the conclusion of the disposition hearing, the Tulare County Juvenile Court committed Trever to DJJ. We will describe the evidence presented at the disposition hearing in our discussion below of Trever's challenge to the disposition.

## *DISCUSSION*

### I.   *Admissibility of surreptitious recording*

Trever argues that the juvenile court erred when it denied his motion to exclude the surreptitious recording.[5] He renews the argument that section 632 applied; and the

---

[5]   Trever frames his argument as a challenge to the sufficiency of the evidence that he committed the offenses, saying the evidence would have been insufficient if the recording had been excluded. He does this, perhaps, in the hope that if we reversed on

exception under section 633.5 did not apply, because Kim was not a party to the recorded communication. Courts in several jurisdictions, applying statutes similar to ours, have adhered to a rule that a parent can consent on behalf of her child under circumstances like these, despite the lack of a reference to vicarious parental consent in the statutes. As we will explain, we concur with the juvenile court in adopting this doctrine.

The underlying facts are not in dispute, and Trever does not now deny that Kim had objectively reasonable grounds for believing the recording would result in evidence of a felony involving violence. The question thus is only of the meaning of the consent the exception to section 632 found in section 633.5, a pure question of law, which we review de novo. (*People v. Nazary* (2010) 191 Cal.App.4th 727, 746-747 [de novo review of application of section 632 where facts not in dispute], overruled on other grounds by *People v. Vidana* (2016) 1 Cal.5th 632, 648, fn. 16.)

Our ultimate task in interpreting statutes is "to ascertain and effectuate legislative intent." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007.) Where the language of a statute is clear, its plain meaning expresses the legislative intent and thus must be followed. "However, if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 (*Torres*).) When looking to the statutory scheme, we interpret particular provisions "so that the whole may be harmonized and retain effectiveness."

---

this basis he could not be retried. As the People point out, however, his argument is really only a challenge to the admissibility of the evidence, for he does not claim the evidence actually presented, including the recording, was insufficient. Retrial is permitted in the case of a reversal resulting in exclusion of the evidence presented at trial because the prosecution, relying on the trial court's evidentiary ruling, might have decided to omit other evidence it could have used. (*People v. Harvey* (1984) 163 Cal.App.3d 90, 107-108.)

(*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814.) "In the end, we '"must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."'" (*Torres, supra,* 26 Cal.4th at p. 1003.)

There are several federal and out-of-state cases, considering the application of similar statutes under comparable circumstances, that are instructive.[6] As will be seen, the weight of the authority from these other jurisdictions heavily favors adoption of the vicarious consent doctrine.

The oldest of the cases adopting the doctrine is *Thompson v. Dulaney* (D. Utah 1993) 838 F.Supp. 1535 (*Thompson*). The United States District Court for the District of Utah ruled that the vicarious consent doctrine applied to the federal wiretap statute where, in the midst of divorce proceedings, a mother secretly recorded telephone conversations her three- and five-year-old sons had with the father, fearing the father was using telephone communications as an opportunity to interfere with her relationship with the children, of whom she had been awarded custody.[7] (*Id.* at pp. 1537, 1543-1544.) The federal statute is a one-party consent statute, unlike section 632, which requires consent of both parties. Section 633.5, however, is relevantly similar to the federal statute in that

---

[6] The issue also has generated at least two law review pieces. (Dinger, *Should Parents Be Allowed to Record a Child's Telephone Conversations When They Believe the Child Is in Danger? An Examination of the Federal Wiretap Statute and the Doctrine of Vicarious Consent in the Context of a Criminal Prosecution* (2005) 28 Seattle U. L. Rev. 955 [arguing in favor of vicarious consent doctrine]; Bogosavljevic, *Can Parents Vicariously Consent to Recording a Telephone Conversation on Behalf of a Minor Child? An Examination of the Vicarious Consent Exception under Title III of the Omnibus Crime Control and Safe Streets Act of 1968* (2000) 2000 U. Ill. L. Rev. 321 [arguing against].)

[7] The federal statute makes it unlawful intentionally to "intercept" any "wire, oral, or electronic communication." (18 U.S.C. § 2511(1)(a).) Among other exceptions, it is not unlawful to intercept a communication under this statute if "a party to the communication" consents. (18 U.S.C. § 2511(2)(d).)

consent of one party under the specified conditions suffices to make the interception lawful.[8] The California and federal statutes also have in common a lack of any express reference to vicarious parental consent. In other words, the question in both instances is whether, where a child is one party to a communication, the statute should be construed as if it stated that a child's parent can validly consent to the surreptitious recording of the communication on the child's behalf, in situations where a party's consent would make the recording lawful.

In holding that the vicarious consent doctrine was applicable, the *Thompson* court reasoned that, under state law, the mother had both a right and an obligation to take, on the children's behalf, actions necessary for their protection. The existence of these parental powers and duties made necessary the application of the doctrine, since there would otherwise be circumstances under which the wiretap law would obstruct their exercise. "[T]his case presents the paradigm example of why vicarious consent is necessary," the court stated. (*Thompson, supra*, 838 F.Supp. at p. 1544.) The court emphasized that in reaching this conclusion, it was concerned with the fact that, at ages three and five, the children were both legally and actually incapable of giving consent themselves. (*Id.* at p. 1543.) The court formulated the doctrine as follows:

> "Thus, as long as the guardian has a good faith basis that is objectively reasonable for believing that it is necessary to consent on behalf of her minor children to the taping of the phone conversations, vicarious consent will be permissible in order for the guardian to fulfill her statutory mandate to act in the best interests of the children." (*Thompson, supra,* 838 F.Supp. at p. 1544.)

The Sixth Circuit adopted *Thompson* in *Pollock v. Pollock* (6th Cir. 1998) 154 F.3d 601, 610 (*Pollock*). Quoting a federal appellate decision on a related issue (the

---

[8] Specifically, the interception becomes lawful under the federal statute any time a party to the communication consents, while under section 633.5, a single party's consent makes the eavesdropping lawful provided it is for the purpose of obtaining evidence reasonably believed to relate to the commission by another party of certain offenses.

application of an exception for situations where the recording was made from an extension phone inside the house), *Pollock* stated: "'We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for that child's well-being." (*Id.* at p. 610.) Noting the *Thompson* court's emphasis on the young ages of the children there, the *Pollock* court nevertheless applied the doctrine to facts involving a 14-year-old child whose own view of the matter differed from that of the mother who surreptitiously recorded her conversations with her father and stepmother. (*Pollock, supra*, at pp. 604-605, 608, 610.) "It would be problematic . . . for [us] to attempt to limit the application of the doctrine to children of a certain age, as not all children develop emotionally and intellectually on the same timetable, and we decline to do so," the court stated. (*Id.* at p. 610.)

*Pollock* appears to be the only federal appellate decision on the issue. Some district courts in the Eighth and Tenth Circuits have followed *Thompson* and *Pollock*. (*Babb v. Eagleton* (N.D. Okla. 2007) 616 F.Supp.2d 1195, 1205-1206; *Wagner v. Wagner* (D. Minn. 1999) 64 F.Supp.2d 895, 899-901; *Campbell v. Price* (E.D. Ark. 1998) 2 F.Supp.2d 1186, 1189.) We have found no other federal cases deciding the issue, and thus none rejecting the doctrine.

Five state supreme courts have adopted the doctrine for purposes of state anti-interception statutes, in each instance finding a parent could consent vicariously despite the lack of an express parental consent provision in the statute. (*People v. Badalamenti* (N.Y. 2016) 54 N.E.3d 32, 37-40 (*Badalamenti*); *Griffin v. Griffin* (Me. 2014) 92 A.3d 1144, 1152; *Commonwealth v. F.W.* (Mass. 2013) 986 N.E.2d 868, 873-875 [adopting doctrine and extending it to adult sibling of child victim]; *State v. Whitner* (S.C. 2012) 732 S.E.2d 861, 864-865; *State v. Spencer* (Iowa 2007) 737 N.W.2d 124, 133-134 (*Spencer*).) Intermediate appellate courts in several other states have done the same. (*Lawrence v. Lawrence* (Tenn. App. 2010) 360 S.W.3d 416, 418-420; *Alameda v. State* (Tex. Crim. App. 2007) 235 S.W.3d 218, 221-223; *Smith v. Smith* (La. App. 2005) 923

So.2d 732, 740; *State v. Morrison* (Ariz. App. 2002) 56 P.3d 63, 65; *Kroh v. Kroh* (N.C. App. 2002) 567 N.E.2d 760, 763-764; *State v. Diaz* (N.J. App. 1998) 706 A.2d 264, 269-270; *Silas v. Silas* (Ala. Civ. App. 1996) 680 So.2d 368, 370-372.)

The most recent of these state cases, the New York high court's decision in *Badalamenti*, contains a thorough discussion. A father suspected his five-year-old son was being verbally and physically abused by the boyfriend who lived with the child's mother. One day, he tried to call the mother by cell phone. In a development that could only happen in the age of cell phones, his call went through, but apparently did so inadvertently, because no one on the other end spoke to the father. He simply heard what was happening in the mother's apartment. The mother and her boyfriend were yelling at the child and threatening to beat and punch him. The father tried using another cell phone to call the land line in the apartment, but no one answered. Then he decided to use a recording function on one of the cell phones to record the conversation he was hearing. The boyfriend continued threatening to hit the child and made reference to a previous beating. (*Badalamenti, supra*, 54 N.E.3d at pp. 34-35.) Months later, the mother's landlady heard an altercation and called the police, leading to the boyfriend's prosecution for assault and child endangerment. (*Id.* at p. 35.) At trial, the father's recording was used as evidence against the boyfriend, who was convicted. (*Id.* at pp. 35-36.)

The recording the father made fell within a state statute against eavesdropping, which required consent of at least one party to the overheard conversation. (*Badalamenti, supra*, 54 N.E.3d at p. 37.) The New York Court of Appeals agreed with the trial court, however, in adopting the vicarious consent doctrine and ruling that the father's consent satisfied the one-party consent requirement, even though he was not a party to the conversation he recorded. (*Id.* at p. 38.) After reviewing the prior case law, the court stated:

> "There is no basis in legislative history or precedent for concluding that the New York Legislature intended to subject a parent or guardian to criminal

14.

penalties for the act of recording his or her minor child's conversation out of a genuine concern for the child's best interests. By contrast, the vicarious consent doctrine recognizes the long-established principle that the law protects the right of a parent or guardian to take actions he or she considers to be in his or her child's best interests. Yet it also recognizes important constraints on that right, by requiring that the parent or guardian believe in good faith that it is necessary for the best interests of the child to make the recording, and that this belief be objectively reasonable." (*Badalamenti, supra*, 54 N.E.3d at pp. 39-40.)

Referring to a discussion in Dinger, *supra*, 28 Seattle University Law Review at page 989, the court also addressed several potential criticisms of the doctrine. (*Badalamenti, supra*, 54 N.E.3d at p. 40.) First, it could be argued that the doctrine could be misused by scheming parents involved in divorce proceedings. The court stated that a parent acting in bad faith and without an objectively reasonable belief that the recording was necessary for the child's best interest would not be found in trial proceedings to fall within the doctrine. (*Ibid.*) Second, it might be thought that the doctrine would allow parents to invade their children's privacy, since even when parents have a good faith, objectively reasonable belief in the need to intercept communications in a child's best interest, the intercepted communications might often extend to matters unrelated to that need. The New York court acknowledged that this was a legitimate concern, but concluded that genuine needs to protect childrens' interests outweighed it. The court also observed that in legal proceedings, irrelevant material would properly be redacted and excluded from evidence. (*Id.* at p. 41.)

The third counterargument was that, at least for older children, substitution of a parent's consent for a child's lack thereof might be thought to be an unacceptable infringement on the child's autonomy. The court's view was that this notion lacked merit because in the eyes of the law, unemancipated minors lack the sort of autonomy at issue. At the same time, the court believed the age and maturity of the child should be factors in a trial court's determination of whether there is a good faith, objectively reasonable belief in the need to intercept communications for the sake of the child's best interest. In other

words, the best interests of older, more mature minors might less often be served by surreptitious interception of their communications by their parents. Trial courts' appropriate consideration of this factor would serve to mitigate the impact of the doctrine on older children's autonomy. (*Badalamenti, supra*, 54 N.E.3d at p. 41.)

Fourth, a critic of the doctrine might contend that it would lead to discord and resentment within families, when children learn their parents have secretly recorded their communications. The New York high court concluded that this possibility was an acceptable cost of the doctrine, justified by its benefits, and also that it can be reduced by trial courts' efforts to exclude irrelevant matter from evidence. (*Badalamenti, supra*, 54 N.E.3d at p. 41.)

We have found no state supreme court decisions rejecting the doctrine. One, *West Virginia Dept. of Health and Human Resources ex rel v. David L.* (W.Va. 1994) 453 S.E.2d 646, referred approvingly to *Thompson*, but held that the doctrine nevertheless did not apply under the circumstances of the case because the recording was made by the noncustodial parent using equipment that had been surreptitiously placed inside the custodial parent's home. (*West Virginia Dept. of Health and Human Resources ex rel v. David L., supra,* at p. 654.)

We have found one intermediate state appellate court decision rejecting the doctrine. In *Williams v. Williams* (Mich. App. 1998) 581 N.W.2d 777, an ex-wife sued her ex-husband, alleging he violated the federal wiretapping law and a state eavesdropping law by surreptitiously recording telephone conversations between him and their five-year-old son. (*Id.* at p. 778.) The trial court granted summary disposition to the father on these claims, concluding that as the custodial parent, the father could consent vicariously on behalf of the son where it was in the son's best interest to do so. (*Ibid.*) The appellate court reversed. Acknowledging the contrary results reached in *Thompson* and *Pollock*, (*Williams v. Williams, supra,* at p. 781 & fn. 3) the court nevertheless believed that because both the state and federal statutes were silent on the question of

16.

whether consent included vicarious parental consent for minors, recognition of the doctrine would constitute an improper enlargement of the statutes' consent provisions. (*Id.* at pp. 779-780.) The court stated that it must presume the legislators intended only the meaning they "plainly expressed" (*id.* at p. 779) and could not "speculate with regard to the probable intent" beyond the "words expressed in the statute" (*id.* at p. 780). The court also believed acceptance of the doctrine was "likely to have widespread implications and may encompass surreptitious actions by parents with less than laudable motives." (*Id.* at p. 781.) Finally, the court suggested that parents involved in custody disputes and needing to take actions in the best interests of their children could obtain authority via court order. (*Ibid.*)

We agree with the reasoning in the cases adopting the vicarious consent doctrine and we think it applies to the one-party consent exception in section 633.5. The key to the analysis is that the Legislature could not have intended to deem a parent a criminal for eavesdropping on his or her child's conversation under conditions like these—and if the conduct is not unlawful under the statute, the statute's exclusionary provision is not triggered. Rejecting the doctrine would lead to a consequence that is absurd and exceedingly unlikely to have been intended by the Legislature.

Our statutes are unlike any of those considered in the prior case law on this topic in that they countenance eavesdropping with a single party's consent only "for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of" listed crimes. (§ 633.5.) As applied to our law, therefore, the vicarious consent doctrine states that section 632 does not prohibit a parent from recording a confidential communication to which his or her minor child is a party if (a) the purpose of the recording is to obtain evidence reasonably believed to relate to the commission by another party to the communication of a crime enumerated in section 633.5; and (b) the parent has a good faith, objectively reasonable belief that the recording is in the best interest of the child.

17.

It might be argued that the exception should be extended to other situations as well. For instance, suppose a parent has two children, sibling A and sibling B, and has a reasonable belief that recording a conversation between sibling A and a third party would produce evidence of an enumerated crime and would be in the best interest of sibling B, who is, let us imagine, a potential victim. Because of situations like this, would it be better to embrace a broader exception than the one we recognize here? Since this case does not present such a situation, it would be inappropriate to express any opinion either way.

Another question is how the doctrine should be applied in cases in which the child is old enough to have, in a meaningful way, his or her own opinion regarding the surreptitious recording of a confidential conversation. Should the vicarious consent doctrine be held not to apply when a 17-year-old wants the confidential communication to be kept secret from his or her parent? We agree with the approach of the New York Court of Appeals on this point: The doctrine remains applicable, but the facts about the minor's age and maturity may be relevant to the question of whether an objectively reasonable basis exists for finding the recording to be in the minor's best interest. It also seems to us that this type of concern will likely be less acute under our statutes, since the presence of a reasonable basis for believing the recording will produce evidence of a crime will often drive the determination of whether the recording is reasonably believed to be in the child's best interest (and the absence of such a basis will render the exception unavailable and thus will moot out the child's-best-interest question).

Trever argues that we should not employ the vicarious consent doctrine simply because it is not contained in the statute, suggesting that the language of the statute is clear and its plain meaning constrains us not to adopt the doctrine. In our view, the statutory language is not clear. The reasoning of the Iowa Supreme Court in *Spencer*, *supra*, 737 N.W.2d 124, is of assistance here. That court explained that the problem under examination was not whether to create a new exception to the state's anti-

interception statute, but to determine the meaning of the one-party consent exception within that statute. The ability of children to consent is often limited as a matter of law, in addition to being often factually absent, as in the case of children too young to comprehend the significance of consenting to the matter at hand. At the same time, the law often vests in parents or guardians a power to consent on behalf of children. The Iowa court's view was that, in light of this background, the term "consent" in the Iowa anti-interception statute was ambiguous, being reasonably subject to interpretations according to which parents did and did not have a role in granting consent to intercept their children's communications surreptitiously. This ambiguity rendered it necessary to find the intent of the legislature by reference to extra-textual considerations, including the policy in favor of adopting a reasonable interpretation that avoids absurd results and best achieves the statute's purpose. (*Id.* at pp. 128-130.)

We are in the same situation. Our law states that both parties' consent is required in general (§ 632) and that one party's consent is sufficient under the exception (§ 633.5), but does not make clear what this means when the parties to the communication are children.[9] Children in California may be legally incompetent to give, or factually incapable of giving, their consent in various situations, and even when they could consent, the law might still empower their parents to consent on their behalf. What, then, does consent mean for children in the context of these statutes? Our answer, which is only a partial answer sufficient to resolve the case before us, is as stated above: The requirements of the consent exception can be satisfied when a parent gives consent on behalf of a minor child based on an objectively reasonable belief that the recording will produce evidence of an enumerated crime and that the recording is in best interest of child.

---

[9]   Section 633.5 does not actually contain the word "consent," but section 632 does, and the reference to section 632 in section 633.5 has the same effect as a provision stating in so many words that a single party's consent suffices to trigger the exception.

19.

The People argue that, in addition to or as an alternative to adopting the vicarious consent doctrine, we should hold that the exclusionary provision of section 632 was abrogated by the truth-in-evidence rule, as we have mentioned. Our holding makes it unnecessary to address this contention.

## II.   *DJJ commitment*

Trever argues that his commitment to DJJ was error. We review the decision for abuse of discretion. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329-1330.) The juvenile court's decision to commit a minor to DJJ must be supported by substantial evidence demonstrating that the commitment will probably benefit the minor and that less restrictive alternatives are inappropriate. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576; Welf. & Inst. Code, § 734.) Among the facts that must be considered are the age of the minor, the circumstances and gravity of the offense, and the minor's previous delinquent history. (Welf. & Inst. Code, § 725.5.) "[T]here is no absolute rule that a [DJJ] commitment cannot be ordered unless less restrictive placements have been attempted," but DJJ is "normally a placement of last resort." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)

The court considered the report and recommendation prepared by the probation officer. A psychological evaluation was prepared by a psychologist at the request of the probation officer. It was not completed in time to be considered before the probation officer's report was prepared, but it was filed separately in the juvenile court and the court considered it. Trever presented testimony by his grandfather, his grandmother, a social worker, and a representative of the Tulare Youth Services Bureau.

The probation report stated that in 2013, someone reported to Child Welfare Services that, according to Trever's younger brother, Trever "inserted his 'thing' into [the brother's] rectum" and molested the brother a total of 22 times. Trever's mother knew of this and, not wishing to involve law enforcement, undertook to keep the brothers separate

20.

on her own. These allegations were investigated, but Child Welfare Services could not substantiate them and concluded they were unfounded.

Trever told the probation officer he was sexually assaulted by a friend of a friend seven years earlier, when he was six. The perpetrator penetrated Trever and forced Trever to orally copulate him. Trever finally told his father about this when he was arrested for the current offenses. Trever also told the officer he was first exposed to sex at age six when an older friend showed him pornography on the internet.

Trever admitted to the probation officer that he raped Ralph, penetrating him and forcing him to copulate him orally, and said he did this because he was upset with Kim, his aunt, and wanted to get back at her. He was upset with Kim because she "did not like him due to the amount of fights he gets himself into," the probation officer wrote. Trever said he regretted doing this and felt horrible for Ralph; but he also reported that he had heard Ralph was evaluated and was found not to have been traumatized.

Before his arrest, Trever lived with his father and younger siblings in Porterville, according to his statement to the probation officer. He had been out of contact with his mother for a year when the probation officer interviewed him. (He had been in custody for 270 days at that time.) He had no prior juvenile record. Trever was with his father attempting to board a bus in Hayward when he was found and taken into custody. He told the probation officer he had a good relationship with his father. He said he was respectful to his father and usually did as he told him. When he failed to obey his father, his father grounded him and took away privileges. He said he was passing all his classes with Bs when he last attended school at juvenile hall in Merced County and had no attendance or behavioral issues there. School records submitted to the court confirmed this. Trever said he had never used alcohol or illegal drugs, had never associated with a gang, and was not receiving any mental health treatment. He believed he had anger issues, however. Trever said he would like to be returned home with his father on

21.

probation, or, if that was impossible, to be committed to the Tulare County Youth Facility to participate in the short-term or mid-term program there.

Trever's father told the probation officer Trever had been experiencing depression and having issues with his mother before committing the offenses. He thought Trever might have been sexually abused by gang members at an early age. He had a good relationship with Trever, whom he considered well-behaved and respectful and who he never imagined was capable of committing such crimes. Trever had never had any issues at school, had never been in trouble with the law before, and did not use illegal drugs or associate with gangs. The father was not aware of any mental health or anger management issues. He was not aware of any developmental delays and reported that Trever was not a client of the Regional Center. He would have liked Trever to be returned home on probation and to receive sex offender counseling.

The probation officer spoke with a therapist who had seen Trever at the Tulare County Juvenile Detention Facility. Trever had two counseling sessions with the therapist. The therapist reported that Trever appeared to play down the severity of the charges against him. Trever had not been diagnosed or given any psychiatric medication up to that time.

Characterizing the offenses, the probation officer stated that Trever sodomized Ralph six times in two hours and 46 minutes and that the crimes were heinous and sophisticated. Further, Trever used fear to accomplish the crimes by threatening Ralph with spanking, leaving him alone, and preventing him from seeing his mother. The crimes also were sadistic, the probation officer wrote, for Trever appeared on the recording to be receiving gratification from Ralph's pain and fear. Trever expressed some remorse, but seemed to minimize the magnitude of the harm done.

The probation officer considered recommending placement with relatives or placement in a foster home or group home, but concluded Trever was a danger to himself and the community and thus required placement in a locked facility. The officer

considered local custody in the Tulare County short-term, mid-term, or long-term programs, but found that these programs would not provide sufficiently intensive or lengthy sex-offender therapy. Consequently, the probation officer recommended that Trever be committed to DJJ. In the officer's view, this placement would provide the most appropriate therapy while also providing 24-hour supervision in a highly secure facility and "instilling discipline" by "holding him accountable for his actions." "It is hoped that the length of the commitment at [DJJ] and the available services, will allow [Trever] sufficient time to gain the tools he needs to refrain from any further delinquent behavior," the probation officer wrote.

A document was admitted into evidence describing the sex-offender treatment program offered by DJJ.[10] The "estimated time to complete the program" was 18 to 24 months, but "the program can be completed in a year if the client is of low risk for reoffending and is motivated." After the client completes the sex-offender treatment program, life-skills services continue to be provided for the remainder of the client's time in custody. Clients of the program are housed in a sex-offender-specific housing unit, but interact with the general population during school hours. The first three months of the program are an orientation phase during which the client undergoes assessment to determine the client's risk level and create an individualized service plan for his or her treatment. The remaining period, estimated at 15 to 21 months, is called the residential phase. During this time, the client participates in individual counseling six or more hours per week, group counseling twice per week for a total of three hours, and large group counseling once per week for two hours. The program includes family counseling and accommodates families unable to travel by conducting telephonic sessions. Finally, the

---

**10** We have found no place in the record where this document was authenticated, shown to be current and correct, or otherwise supported by testimony. But no party has challenged its accuracy as a description of the services available to Trever at DJJ.

program includes reunification and re-entry services to assist clients when they return home.

The psychological evaluation was filed in the juvenile court two days after the probation report. It was prepared by Donna Snow, M.S., a psychological trainee at Alliant International University. Snow interviewed Trever for two and a quarter hours and administered four psychological tests: the Wide Range Achievement Test, Fourth Edition (WRAT-IV); the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV); the Personality Inventory for Youth (PIY); and the Juvenile Sex Offender Recidivism Risk Assessment Tool, Second Edition (JSORRAT-II).

In contrast to his statement to the probation officer, Trever told Snow he had been living with a friend of his mother—not with his father—before he was taken into custody. He said he had not seen his father for three or four months before that time. Also living in the mother's friends home were three cousins, two aunts and an uncle. Trever said he moved around between the homes of his father, his mother's friend, and his mother. He had not seen his mother in over a year, did not have a good relationship with her, and considered her to be a "'crack head who sits on the couch and smokes weed all day.'" He had a good relationship with his father. Both his father and his mother had been arrested multiple times and spent time in jail.

Trever told Snow he had been neglected by his mother when he was younger. She would sometimes leave the house for days, leaving Trever and his younger brother alone. Once, when he was 10, she left him alone in a park for five days. Trever said his mother was using drugs during these incidents. Snow described a Child Welfare Services report according to which, in 2011, someone dropped Trever and his brother off at a public pool in the care of a 12-year-old neighbor. Trever got a severe sunburn and someone called an ambulance. Paramedics determined that Trever did not need to go to the hospital.

Trever described to Snow the incident in which he was sexually assaulted at the age of six. He said it took place over a period of three days. The perpetrator was an

24.

adult, who showed him pornography before assaulting him. Trever said he liked the pornography and it made him aroused. He never told anyone about the incident before his arrest and dealt with it at the time by going home and sleeping. He described his reaction as frightened but not upset.

Trever told Snow that before his arrest, he was getting Cs and Ds in school. He said that, in spite of this, he was asked to join classes for gifted students, but he declined. He said he got along with teachers but hated female teachers because they did not like him. He did not know why they did not like him. He said he was expelled from a school in first grade because he cut another student with scissors. Laughing, Trever told Snow this had been an accident. Trever also said he had been suspended for fighting more times than he could remember.

Snow asked Trever about sexual feelings and activities. He told her he was heterosexual and wondered why anyone would question his sexual orientation. He said other minors in juvenile hall knew of his offense and assumed he was homosexual; this angered him. He claimed he had had 60 or more girlfriends around the state, and, because he often moved, he sometimes left them without remembering to break up. Usually the girls were a year or two older than him and he lied to them about his age. He was not sure whether he had broken up with his most recent girlfriend. He said he first kissed a girl when he was seven and first gave a girl a hickey when he was 10 or 11. He once digitally penetrated and engaged in oral copulation with a girl a year older than him. He had never had vaginal intercourse. He said he was "strict" with girls, meaning that when he had a girlfriend, he would forbid her to see friends or do things unless he was present. He thought the girls liked this. (Trever also described his father and his mother's ex-husband as "strict military" men.

Trever said he began viewing pornography regularly after he was shown pornography and assaulted at age six. He watched pornography two or three times a week on a cell phone or tablet. He said he liked it and it made him feel "'horny.'" He

viewed heterosexual pornography, lesbian pornography, pornography involving group sex, and violent pornography. He thought about pornography every day, most of the day, even when he did not want to think about it. He said his sexual fantasies were about consensual heterosexual, lesbian and group sex. He denied fantasizing about rape or violent sex. He said he had never coerced anyone to engage in sexual activity except during the current offenses.

Trever discussed the therapy he had been receiving while in custody. He said he was working on "anger" with the mental health staff, but he kept things from them he thought he should be telling. Specifically, he never mentioned the nightmares he had two or three times per week. These were about the sexual assault he experienced at age six. He also sometimes thought about that incident during the day and could not get the thoughts out of his mind. He often feared going to friends' homes because he could be victimized again. He said he began having trouble sleeping after that assault and still only slept about four hours per night. Currently, he felt depressed two or three days each week and constantly felt anxious.

Snow asked Trever about the occasion on which he was accused of sexually assaulting his brother. In response, Trever "became enraged; his face turned red and he slammed his fists on the table while demanding to see the evidence for the offense." He demanded to know how Snow knew about the allegation, which he believed was confidential. It took him several minutes to calm down. Then he explained that the accusation had made him furious at the time. He said his grandmother made up the story because she did not like Trever and was a drug user and an alcoholic. Trever became angry again when Snow pointed out the similarity between that alleged incident and the current offenses. He said he would kill himself if he had really subjected his brother to a sexual assault.

When Snow questioned Trever about the current offenses, Trever at first denied penetrating the victim. When Snow said the recording indicated what really happened,

Trever was angry that Snow had been given access to it. After this, Trever admitted sodomizing the victim "'quite a few times.'" He said, "'Yes, I raped a child.'" He said he did it because he was angry at his aunt.

Trever stated that on the first day of babysitting, the day before the offenses, he showed pornography to Ralph and was aroused by the pornography. He said he knew Ralph also was aroused because he "'saw his pants rise.'" When Snow asked about other facts of the assault, such as the oral copulation, Trever said his "'mind went blank'" during the attack and he did not remember everything that happened. When Snow asked how he could continue assaulting Ralph while Ralph was screaming in pain and begging him to stop, Trever again said his mind went blank. He was thinking only about sex and how it felt.

Trever told Snow he would never do such a thing again, and if he did he would commit suicide. But he also said the attack "'wasn't that bad, he's not dead.'" He believed he would be released after his next court date, though he said he would like to be sent to a boot camp because he liked working out. When asked what he would say to the judge if he could, he said he wanted to "'cuss him out'" for "putting him in this situation." Then he told Snow not to put that in the report of the evaluation, and to write instead that he knows he made a mistake and regrets it.

Trever said he had "999" good friends and maybe more, but explained that these were Instagram friends. He also had actual friends, with whom he hung out daily before his arrest, spending time at their houses and going out to restaurants and stores. He preferred female to male friends. He had trouble making friends while in custody because the other inmates knew about his offenses. He said he had twice been in fights after being attacked by female detainees because of the nature of his offenses.

Regarding his medical history, Trever said he had twice injured his head, once at age five when he fell off a bed while jumping on it and striking his head on another piece of furniture, and once at age 10 or 11 when boxing with uncles and a cousin. When he

27.

was nine he broke his left arm in a bicycle crash. At 12, he fell off a platform at a carnival and broke his wrist. (At various places in the record it is stated that Trever's mother and father and his aunt and the aunt's boyfriend were all carnival workers, and the trailer in which the current offenses took place was located at the Merced County Fairgrounds during a carnival. Trever said he had been working at carnivals himself during the summers since he was 10.

Trever told Snow he had received medical attention for pain in two teeth while in custody. He said one tooth was infected and needed to be pulled and the other needed a root canal. Once, he pretended to cry in front of a doctor with the intent of giving the impression that his teeth were causing more pain than they really were, so that he would be treated more quickly. Other than pretending to cry to deceive the medical staff while in custody, Trever said he had never cried, except one time, when he was first incarcerated after his arrest.

The WRAT-4 (the cognitive functioning assessment) measured Trever's scholastic achievement in several areas. The results indicated average ability relative to others his age in reading and arithmetic and below average ability in spelling. The WISC-IV (the intelligence test) indicated a full scale intelligence quotient in the low average range. The PIY (the personality inventory) indicated impulsivity, a failure to complete tasks, and poorly modulated expression of anger.

Trever's score on the JSORRAT-II (the sex offender recidivism risk assessment) indicated that he fell within the risk group for which it is reasonable to expect only a moderate proportion of individuals to re-offend. In Snow's view, however, this result probably underestimated Trever's recidivism risk. Several factors not captured by the test supported this view: his apparent arousal by the violence and control evidenced in the recording; the continuation of the attack despite the victim's screams of pain and pleas to stop; the use of threats to leave when Trever knew Ralph was terrified of being left; the use of pornography, including violent pornography, from a young age; Trever's

admission that he thought about pornography every day; the allegation that Trever committed a similar attack on his younger brother; Trever's victimization by a similar attack when he also was very young; his lack of empathy for the victim; and his lack of a reliable family support system.

Snow made a diagnosis of conduct disorder, childhood onset, with limited prosocial emotions, severe. Conduct disorder is "[a] repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated," as manifested by specified criteria, such as frequently starting fights, having been cruel, having forced sexual activity on another, deliberately destroying property, stealing, and lying to gain advantages. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) 469-470 (DSM-V).) The facts on which Snow based this diagnosis were the reports of frequent fighting, the current offenses, and the deceptive behavior to medical staff about his tooth pain. The specification of limited prosocial emotions was based on the lack of remorse and callousness toward the victim. Snow also diagnosed post-traumatic stress disorder based on the nightmares, flashbacks, guilt and fear related to the sexual assault of which Trever was a victim.

Snow's recommendation was that Trever be required to complete individual sex offender treatment and group therapy focusing on his sexual behavior, both in a structured environment. Snow further recommended therapy to address Trever's own victimization. Snow's recommendation included an opinion that Trever should be placed in "protective custody" while incarcerated because he would be in danger of violence from other wards due to the nature of his offenses.

After several continuances, the dispositional hearing took place over two days, April 26 and May 3, 2016. On the first day, Trever presented a case plan according to which he would be released to live with his grandfather with electronic monitoring and would receive sex offender counseling on an outpatient basis from the Tulare Youth

29.

Service Bureau (TYSB), a private, non-profit mental health services provider. A social worker named Rosemary Gonzalez, from the public defender's office, submitted this case plan in writing and testified in support of it. Gonzalez testified that the TYSB program was designed to help those who are both perpetrators and victims of sexual abuse. Trever would also participate in mentoring with an adult through Big Brothers-Big Sisters of Tulare County. Gonzalez testified that Trever himself was amenable to this plan.

Trever's maternal grandparents also testified in support of the plan. The grandfather said Trever would live in his house and he would take all necessary measures to ensure Trever attended counseling and had no unsupervised contact with other children. The grandmother (who was no longer married to the grandfather) testified that she was retired and could devote her time to helping supervise and care for Trever She had been a nurse and had experience in the mental health field.

Trever's counsel argued in favor of this plan. The People argued for a disposition in accordance with the probation officer's recommendation. The trial court was leaning toward a DJJ commitment, but was not yet persuaded either way and continued the hearing to allow Trever to bring in a witness who could provide further information about the treatment program offered by TYSB.

On the second day, the court heard testimony by Pablo Martinez, a therapist and supervisor employed at TYSB. Martinez testified that TYSB's program was called the Adolescent Sexual Responsibility Program (ASRP). The program "[t]ypically" lasted "about a year to two years depending on the client." It began with a psychological assessment and an assessment of recidivism risk. Then the client would begin weekly individual therapy and also group therapy if appropriate for the client. Martinez believed a strength of the program for Trever was that it was designed specifically to address the needs of sex offenders who had themselves been sexually abused. With respect to Trever's placement, Martinez testified that the ASRP could provide therapy even if Trever was in custody in the Tulare County Juvenile Detention Facility (JDF). A

30.

therapist could come to JDF to see Trever weekly and might also see other sex offenders housed there (as would be necessary for there to be a possibility of group therapy for Trever).

Questioned about how the ASRP compared with the sex offender treatment program available at DJJ, Martinez testified that his supervisor considered DJJ's program to be of high quality, but Martinez was concerned about the effects on Trever of associating with the other wards there. He pointed out that DJJ's population included not just sex offenders but also wards involved in various other kinds of criminal activity, while Trever had no other history of offending. Martinez also said he was not sure whether the DJJ program had any features to address the needs of offenders who had been abused themselves.

A document was admitted into evidence summarizing the features of the ASRP as implemented within JDF. It stated that clients received individual counseling a minimum of one to two hours per week, with the possibility of an increase in accordance with the needs of the individual. The possibility of group therapy depended on there being three participants deemed appropriate for group work in custody and in the program. The program included the development of an offense prevention plan and counseling preparatory to discharge from JDF, with assistance in transitioning to an outpatient sex offender treatment program to provide ongoing post-release therapy.

On cross-examination, Martinez testified that clients in the program typically had an hour to an hour and a half of individual counseling per week. He did not know whether there were two other clients at JDF who could make up a therapy group with Trever, and TYSB had not conducted any therapy groups at JDF for some time. He opined that group therapy, though beneficial, was not necessary for success in the program. He said a highly motivated client could complete the program in a year; a less motivated client might take two years.

At the end of the hearing, the People argued again in support of a DJJ commitment. In light of the severity of the conduct, Trever's low levels of empathy and remorse, and Snow's conclusions about Trever's risk of reoffending, the deputy district attorney believed the less intensive therapy that would be available to Trever through TYSB while at JDF would be inadequate. Further, even if TYSB's counseling program could last longer than a year, a local JDF commitment under the long-term program would still only be for a year. DJJ's program would provide far more intensive counseling, including several times as many hours of therapy each week; and because of the potential length of a DJJ commitment, Trever could receive this intensive counseling in a locked facility for a substantially longer time.

In his closing argument, Trever's counsel referred to a recent decision in another case in which a ward was committed to JDF and ordered to undergo sex offender treatment while in custody through a program provided by Alliant International University. (It appears from a document in the record that this program is less intensive than the one offered by TYSB, in that it involves an hour and a half of group therapy per week plus individual counseling one hour per month. Counsel's point in mentioning it seems to have been only that a program of sex offender counseling was feasible for a ward committed to JDF.) Defense counsel also argued that the court ought not to rely on the allegation that Trever committed a prior sexual assault against his brother, since the conclusion of Child Welfare Services was that this allegation was unfounded.

Trever's main argument, however, was that DJJ would be a harmful environment for Trever. Counsel referred to the risks associated with the presence of other, older wards with extensive offense histories, risks recognized by Snow's evaluation. Further, Trever's family would be far away if he were committed to DJJ, and even if a placement with relatives were found unsuitable, Trever's family could still provide support if he were in local custody. Also very significant, in counsel's view, was that a DJJ commitment for these sex offenses would trigger the lifetime sex offender registration

32.

requirement. This would limit his future employment prospects and make it difficult for him to find housing in the county as an adult. The court could commit Trever to JDF with a counseling program and still retain jurisdiction to resort to a DJJ commitment later if Trever failed to make progress in the less restrictive placement. Counsel described DJJ as "the nuclear option" and contended that the court should reserve it as a last resort.

In its oral ruling, the court found that sex offender treatment would be available to Trever if he were committed to JDF in the long-term program. But the quantity of individual therapy provided would be less than at DJJ and there might be no group therapy. DJJ had the most comprehensive therapy available. In finding that local custody with the therapy available there would be inadequate, the court emphasized its view that the offenses were extreme. The sexual assault was "among the most violent I've ever seen in 21 years in the criminal justice system," it said. (The court also stated, however, that it was not relying on the allegation that Trever had previously molested his brother. The court had doubts about Trever's amenability to treatment because there was evidence that Trever did not consider his conduct to be extreme (having said it was "not that bad" because Ralph was "not dead"), admitted to Snow that he did not tell important things to his therapist, wanted to cuss out the judge, thought his situation was the judge's fault, and told Snow to omit this from the psychological evaluation and write that he was sorry instead. The court thought these were all indicators that Trever would be inclined to try to manipulate the system instead of really trying to be rehabilitated, and this in turn indicated that the most intensive therapy available was needed. The court also cautioned against "demoniz[ing] DJJ based on prior history," and opined that "DJJ is not the horrific environment" it is often considered to be. The court declared Trever a ward, committed him to DJJ, and found the maximum term of confinement to be 52 years, less 320 days time served.

In our view, the juvenile court properly relied on the more intensive and longer-lasting program of therapy at DJJ. The alternative program proposed by the defense was

far less substantial. In light of the gravity of the offenses, the evidence of Trever's attitude toward them, and the other facts in the well-developed record of his mental condition, the court could reasonably find it was probable Trever would benefit from the DJJ program and the alternative presented by the defense was not adequate for his needs.

Trever contends that DJJ should only be used as a last resort, after less restrictive alternatives have been tried and found ineffective. This is, indeed, normally the case, but as we have said, there is no rule that other placements must be tried in all cases. The trial court had discretion to find that Trever's circumstances, the facts of the offenses, and the forms of treatment available at DJJ and elsewhere justified resorting to DJJ directly in this instance.

Trever maintains that his age and lack of prior adjudications show that a less restrictive alternative should have been tried first. Again, these are important factors and they ordinarily point to a less restrictive alternative. But the evidence in the record—about the offenses, the minor, and the treatment regimes available in the various placement alternatives—brought a first-instance DJJ commitment within the juvenile court's discretion in this case.

Trever argues that his recidivism risk according to the J-SORRAT-II test results was only moderate, and this supported a non-DJJ disposition. The juvenile court, however, could reasonably rely on the evaluator's well-supported opinion that this test result did not reflect the true risk, which was higher.

Trever argues that he will face danger and harmful influences at DJJ because the wards there are mostly older and have more extensive records, and because his offenses will make him a target. In the trial court, the defense stressed that the lifetime sex offender registration requirement triggered by the DJJ commitment will forever marginalize him and impair his efforts to integrate into society as an adult. These are real concerns and we do not dismiss them. But they were brought to the trial court's attention and we are not persuaded it was an abuse of discretion to find, under the totality of the

34.

circumstances, that the commitment still would benefit Trever and less restrictive alternatives still would be insufficient.

## ***DISPOSITION***

The judgment is affirmed.

**************

_____
                                                    SMITH, J.

WE CONCUR:

_____
POOCHIGIAN, Acting P.J.

_____
FRANSON, J.